104

91 A.3d 55

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Maurice PATTERSON, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 15, 2013.

Decided April 28, 2014.

110

112

Kyle W. Rude, Esq., Schemery Zicolello, P.C., Michael J. Rudinski, Esq., Williamsport, for Maurice Patterson.

Eric Ross Linhardt, Esq., Kenneth A. Oskow, Esq., Lycoming County District Attorney's Office, Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

PER CURIAM OPINION.

Maurice "Boo" Patterson ("Appellant")[1] appeals the judgment of sentence of death imposed after he was convicted by a jury of first-degree murder,[2] criminal conspiracy,[3] and criminal solicitation.[4] For the reasons that follow, we affirm.

## I. Background

The charges against Appellant arose from the fatal shooting of Eric "Bop" Sawyer ("victim") by Sean "Raydar" Durrant, in an alleyway in the city of Williamsport, Pennsylvania, on March 30, 2007. Durrant confessed to shooting the victim, but claimed he did so at the behest of Appellant, who had been incarcerated in the Lycoming County Prison since March 1, 2007. At Appellant's trial, Durrant testified that he first met Appellant while the two were previously incarcerated. In or

1. Appellant testified that people also knew him as "Banks" or "Boo Banks." N.T. Trial, 5/21/10, at 98.

2. 18 Pa.C.S.A. § 2502(a).

3. 18 Pa.C.S.A. § 903.

4. 18 Pa.C.S.A. § 902.

around July 2006, after both men had been released from prison, they ran into each other in Williamsport, Pennsylvania, and Appellant introduced Durrant to Javier "Little Man" Cruz–Echevarria ("Cruz"). Subsequently, Appellant, Cruz, and the victim went to Durrant's house on two separate occasions to discuss drug dealing, but Durrant told the men he wasn't interested in working with the victim because he didn't know him. Several weeks later, Durrant asked Cruz why he hadn't seen Appellant and Cruz "hanging around" with the victim for a while, and Cruz told Durrant that the victim was working as a police informant. At some point thereafter, Appellant and Cruz told Durrant they wanted the victim killed because he was a "snitch," and Durrant agreed to do the killing.

Durrant further testified that, during the week prior to the murder, Cruz brought a 12–gauge shotgun, with the butt partially sawed off, to Durrant's house for use in killing the victim. Durrant went to a Lowes store to purchase a hacksaw, which he then used to further saw down the barrel of the gun. On the evening of March 30, 2007, Durrant told Cruz to call the victim and ask him to meet in an alleyway under the pretense of arranging a drug deal. When the victim arrived in the alleyway, Durrant, who had been waiting for him, shot the victim twice in the head, killing him. Durrant and Cruz fled the alleyway in Cruz's vehicle, and the police immediately gave chase. After several blocks, Cruz stopped the vehicle, at which time Durrant exited the car, dropped the shotgun in the road, and unsuccessfully attempted to run away. Durrant pled guilty to third-degree murder and was sentenced to 25 to 60 years imprisonment in exchange for his agreement to testify against Cruz and Appellant.

In order to establish a conspiracy among Durrant, Cruz, and Appellant, the Commonwealth introduced, *inter alia,* a handwritten letter, dated March 25, 2007, that Appellant sent Durrant from prison. Durrant testified that he received the letter on March 27, 2007, and that he and Cruz read the letter together. The letter provided:

What's up bro hows both of my brothers doing out there. It's time to smash the myth. When the heads gone the body falls that's bullshit. I know sometime it seem like am comin down on ya'll niggaz. But you know its kind of hard yah mean to run a business from in here. Jav your my little brother but rite now Vegas is lookin at the whole team. That move down in Miami you already know what it is. To you Raydar you my little big brother and you know that. I really can't tell you how proud I am of the both of ya'll. Oh yeah I came cross a little homie in here from Newark. When he get out look out for em. Now on to business, I see ya'll numbers is gettin higher. You know am wit anything thats gonna make me more money. Raydar you should have the word by the end of this week. About that *Hit* record. When I gave the word tear that ass out the frame. Don't make it a personal job its only business. Little Man you already know whats up make sure that move is taken care of. Yeah tell ya chick little man to make show them pics come out *real* nice. Raydar and Jav tell my sisters I said whats up. And kiss my nephews and nieces for me. Little man make sure that bank account gets open. If need be little man get another phone. We ain't tryin to repeat last week.

Peace Out

Three Kings for Life [5]

N.T. Trial, 5/19/10, at 61 (Commonwealth Exhibit 33A) (Reproduced Record ("R.R.") Vol. 3, at 1077A). Durrant testified at trial that phrase "[Raydar] [y]ou should have the word by the end of this week about that hit record" was a reference to "putting a hit out and killing Eric Sawyer." N.T. Trial, 5/19/10, at 65–66.

**5.** As discussed *infra*, Appellant was confronted with the letter when he was interviewed by police at SCI–Smithfield on May 22, 2008. Appellant indicated that the letter was written by a fellow inmate, Shaun Cormier, but admitted that Cormier wrote exactly what Appellant told him to write. Appellant denied, however, instructing Cormier to underline the words "hit" and "real." N.T. Trial, 5/20/10, at 183.

The Commonwealth also introduced recordings of a number of telephone calls Appellant made from prison[6] to other individuals on the days leading up to the murder, as well as a recording from a prison visitation, including the following:

**March 24, 2007, 9:23 p.m.** Appellant called his girlfriend, Kendra Burrage,[7] and instructed her to tell Cruz to be at Burrage's mother's house with Durrant at 2:00 p.m. the next day.

**March 25, 2007, 1:58 p.m.** Appellant called Burrage's phone in order to speak with Durrant and Cruz.[8] At one point, Durrant asked Appellant to let him "take care of [the victim,]" to which Appellant responded "hold fast on that" because he needed to "check on some other paper work." N.T. Trial, 5/19/10, at 74–75. Appellant then told Durrant that, once he gave the word, Durrant could kill the victim. Later during the call, Appellant and Cruz are laughing, and Appellant states "Raydar, he wants that bull bad. He wants that bull bad, but I can't sanction that just yet." *Id.* at 78. Appellant tells Cruz that he'll "have the word by Tuesday" [March 27, 2007]. *Id.*

**March 27, 2007, 5:58 p.m.** During a prison visit with Cruz, Appellant told Cruz that Eric Sawyer had to be "done by" Saturday [March 31, 2007]. *Id.* at 80.

**March 27, 2007, 7:58 p.m.** Appellant had the following conversation with Cruz and Durrant:

**Cruz:** Yeah, I made that call about you know that other boy, and I told him you know it's done you know I need you know I wanna pass the tourch over basically. So you know. I'm gonna meet him tomorrow.

**Appellant:** On what note?

---

**6.** All of the calls were initiated by Appellant, as inmates could not receive incoming calls. N.T. Trial, 5/18/10, at 118.

**7.** Burrage is alternately referred to in the record as Appellant's girlfriend, his fiancée, and his wife; for consistency, we will refer to her as his girlfriend.

**8.** Durrant testified that Appellant communicated with him and Cruz by calling Burrage's or Cruz's phone. N.T. Trial, 5/19/10, at 70.

**Cruz:** What do you think on gettin' the numbers, gettin' the numbers up.

**Appellant:** where Radar at? Cruz: Here you go.

**Durrant:** I got your kite [9] today. yeah. yeah you know. everything is everything. He told me what's up with that other thing alright so that's goin' be tookin care of. I'm goin up to Lowe's and get your saw joint and break him down a little bit more.

**Appellant:** Okay, I feel that.

**Durrant:** And, I'm gonna handle that.

**Appellant:** Listen. when that's taken care of we all can breath alot easier cuz you know I did business with that chump.

**Durrant:** Right. [T]hat's the man I was talkin' too.

**Appellant:** Yeah, I did some business with that chump and I don't need that. I don't need that and the rest of the organization do not need that comin' back on nobody. There's three kings and you one of um baby so you know we all in this mother fuckin' boat together.

**Durrant:** I'm gonna make sure ain't nothin' goin come back while I'm livin'.

**Appellant:** Okay, that's what's up baby.

Commonwealth Exhibit P–30.

**March 30, 2007, 8:53 p.m.** In speaking with Appellant, Cruz says: "[A]bout that other king that's going to be handled tonight." Appellant replies "[W]hich one?" and Cruz responds "[W]ho do you think? The other king." Appellant states "[T]here's only three of us dog," to which Cruz replies "[W]ell, the fake one." N.T. Trial, 5/19/10, at 88–89.

**March 30, 2007, 9:27 p.m.** Appellant calls Cruz and tells him "listen, don't force it if it ain't clickin tonight don't force it." *Id.* at 91.

In addition to Durrant's testimony, and the recordings identified above, the Commonwealth presented the testimony of David Lehman, who testified that, in December 2006, when

9. A "kite" is a letter. N.T. Trial, 5/19/10, at 84.

he was living with a woman named Marion Diemer, several firearms, including a shotgun, were stolen from his home. Lehman identified the gun dropped by Durrant in the middle of the road after the victim was shot as the shotgun stolen from his home, although he noted it was full-length when it was stolen. N.T. Trial, 5/18/10, at 18–22.

Marion Diemer testified that, in December 2006, she did, in fact, remove several guns, including a shotgun, from Lehman's residence, with the intent of trading them for drugs. Diemer stated that she took the weapons to Gregory Ricks' house, and that Ricks made a phone call to a man named "B." Thereafter, Ricks and Diemer drove to a gas station with the shotgun. As they sat in the car, an individual Diemer subsequently identified as Appellant got into the back seat of the vehicle, whereupon Ricks showed him the shotgun and exchanged it for drugs. *Id.* at 35–51.

Police Agent Leonard Dincher testified that, on May 21, 2008, he obtained a warrant for Appellant's arrest. The following day, Agent Dincher and several other officers, including Captain Raymond Kontz, went to SCI–Smithfield to execute the warrant. Appellant was brought to an inmate meeting room, where Agent Dincher and another officer read Appellant his *Miranda*[10] rights. During the interview, Appellant indicated that he first learned of the victim's death on the morning of March 31, 2007, when someone in his cellblock told him that someone had been killed with a shotgun. N.T. Trial, 5/20/10, at 116. Appellant also indicated that the victim was a friend of his, and was going to be in Appellant's wedding. *Id.* at 117. When Agent Dincher asked Appellant why Cruz and Durrant would have wanted to kill the victim, Appellant initially claimed he could not think of any reason, but then suggested it was because the victim was going to be put in charge of the drug operation. *Id.* at 120–22. Agent Dincher then showed Appellant a copy of the March 25, 2007 letter Appellant sent to Durrant. Appellant admitted that all of the words were his own, but that his cell mate, Sean Comier,

10. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

wrote it for him because Appellant's hand was "messed up." N.T. Trial, 5/20/10, at 127. Appellant further claimed that the letter "was about the drug business." *Id.* at 150. At one point, Agent Dincher told Appellant that Durrant was claiming that Appellant ordered the victim's killing; thereafter, Appellant threatened, at three separate times, to kill Durrant. *Id.* at 129. Appellant also indicated that he had "touched the murder weapon." *Id.* at 131.

Appellant took the stand in his own defense, and admitted that he dealt drugs, but denied that he wanted the victim killed. Appellant instead suggested there was animosity between Durrant and the victim, primarily because Durrant was "getting high" and had "messed up some of [the victim's] money." N.T. Trial, 5/21/10, at 115. Appellant further maintained that the March 25, 2007 letter referred to drugs, and not to any plan to hurt the victim. *Id.* at 137–45.

During the prosecutor's cross-examination of Appellant, the Commonwealth played a number of additional prison recordings of telephone conversations and visitations involving Appellant, including a call between Appellant and Burrage wherein Appellant states "say it ain't so," and asks Burrage "[w]here is my little brother?" N.T. Trial, 5/24/10, at 11, 14. The Commonwealth also introduced recordings of the following conversations:

**March 31, 2007, 5:56 p.m.** During a visitation with Burrage, Appellant told her that "[i]f you all two got to tear that fuckin house up looking for the money find that money." N.T. Trial, 5/24/10, at 31. Appellant testified at trial that he had instructed Burrage to go with Tamika Simpson, Cruz's girlfriend, to retrieve from Cruz's house money that had been collected by Cruz, but belonged to Appellant.

**March 31, 2007, 7:32 p.m.** Appellant called Burrage and told her and Simpson, who was with Burrage at the time, to count the money. Appellant told them he was going to call them back at 8:00 p.m. with further instructions. *Id.* at 35. Appellant further told Burrage to make contact with Nicole Durrant, but when Burrage indicated that the police were

around Durrant's house, Appellant advised her to stay away. *Id.* at 36–38.

**March 31, 2007, 7:58 p.m.** Appellant spoke with Burrage, who was with Simpson and Nicole Durrant. Appellant told Burrage "I feel a little bit better cause if Raydar is saying that, you know, if the Bull is saying, you know, that might keep Little Man safe." *Id.* at 65. Appellant also told Burrage to "[a]sk her [Nicole Durrant] in his own words did he tell them that he was the hitter?" *Id.* at 68. Appellant instructed Burrage to tell Nicole that they will "do what we can for [Durrant]" and that they'll get "appeal money." *Id.* at 69.

**March 31, 2007, 8:57 p.m.** Appellant spoke with Burrage and again stated that he was "feeling better." Burrage's mother, Patricia Young, then got on the phone and asked if the victim was the same person that was supposed to be in Appellant's wedding, and Appellant responded, "mom, they record these phones." *Id.* at 75.

Appellant consistently maintained that, at the time the above conversations took place, he was unaware that the victim was Eric Sawyer, and, further, that when he stated he was feeling better it was because he knew Cruz was not involved in the murder. *Id.* at 73.

On May 26, 2010, a jury convicted Appellant of all charges. During the penalty phase, the jury concluded the one aggravating circumstance—that Appellant had a 1997 conviction for third-degree murder [11]—outweighed the mitigating factors offered by the defense, which included disparity of sentence and evidence regarding Appellant's childhood; thus, the jury was required to return a sentence of death.[12] On May 28, 2010, the trial court formally imposed a sentence of death on the murder conviction, life without parole on the criminal conspiracy conviction, and no further penalty on the criminal solicitation conviction.

11. 42 Pa.C.S.A. § 9711(d)(11).
12. 42 Pa.C.S.A. § 9711(e)(8).

Appellant filed post-sentence motions on June 7, 2010 and April 4, 2011. The motions were denied on January 17, 2012. However, upon discovering that Appellant's sentence for criminal conspiracy was an illegal sentence, in that it exceeded the maximum sentence for the crime, *see* 18 Pa.C.S. § 1102(c) (sentence is 20 or 40 years, depending on whether there is a specific finding of fact that serious bodily injury resulted from the conspiracy), the trial court vacated that portion of Appellant's sentence and resentenced him to 10 to 20 years, to be served concurrently with his death sentence for the murder conviction. Order, 4/24/12. Appellant filed a timely appeal to this Court.

## II. Discussion

### A. *Sufficiency of the evidence*

As we are required to do in every capital case, we begin by reviewing the evidence to ensure that it is sufficient to support Appellant's first-degree murder conviction. *See Commonwealth v. DeJesus,* 580 Pa. 303, 860 A.2d 102, 114 (2004). We are required to conduct such review even where an appellant does not specifically raise such a challenge, as in the instant case. In reviewing the sufficiency of the evidence, we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the jury's verdict beyond a reasonable doubt. *Commonwealth v. Murray,* 623 Pa. 506, 83 A.3d 137, 150–51 (2013). Whether sufficient evidence exists to support the verdict is a question of law; thus, our standard of review is *de novo* and our scope of review is plenary. *Id.* at 151.

In order to obtain a conviction for first-degree murder, the Commonwealth must establish that a human being was unlawfully killed; the defendant perpetrated the killing; and the defendant acted with malice and a specific intent to kill. *Id.* Specific intent to kill may be inferred by the use of a deadly weapon upon a vital organ of the body, and the Commonwealth may prove the specific intent to kill necessary

for first-degree murder wholly through circumstantial evidence. *Id.*

Additionally, each member of a conspiracy to commit homicide may be convicted of first-degree murder, regardless of who inflicted the fatal wound. *Commonwealth v. Smith*, 604 Pa. 126, 985 A.2d 886, 895 (2009). In order to convict a defendant as a conspirator, the Commonwealth must prove: (1) that the defendant intended to commit or aid in the commission of the criminal act; (2) that the defendant entered into an agreement with another to engage in the crime; and (3) that the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. *Id.*

Upon review, we conclude that the evidence produced by the Commonwealth at trial, and all reasonable inferences deduced therefrom, when taken in a light most favorable to the Commonwealth, support the jury's verdict that Appellant was guilty of first-degree murder as a conspirator in the death of the victim, Eric Sawyer. Dr. Samuel Land, a forensic pathologist who reviewed the victim's autopsy report and other exhibits, testified that the victim died as a result of two shotgun wounds to the left side of his head, which destroyed vital portions of the victim's brain. Dr. Land further opined, to a reasonable degree of medical certainty, that the manner of death was homicide. N.T. Trial, 5/18/10, at 154, 158. Moreover, Durrant confessed to shooting the victim in the head. Thus, the evidence clearly was sufficient to enable the jury to conclude the victim was intentionally killed.

In addition, as discussed above, Durrant testified that he killed the victim at the request of Appellant and Cruz, who told Durrant they wanted the victim killed because he was a snitch. The shotgun Durrant used to kill the victim was given to him by Cruz, and was the same gun that Marion Diemer and Gregory Hicks traded Appellant for drugs. The Commonwealth also introduced evidence of a series of telephone conversations between Appellant and Durrant and/or Cruz, wherein Appellant instructed them to "take care of" or "deal

with" the victim, once Appellant gave the word. As this evidence was sufficient to enable the jury to conclude that Appellant conspired with, and, indeed, instructed Durrant to kill the victim, the evidence was sufficient to support Appellant's conviction for first-degree murder as a conspirator.

## B. *Videotape of murder scene*

The trial court allowed the Commonwealth to introduce at trial a redacted videotape of the crime scene. The tape consisted of approximately six minutes of footage which showed the victim's body, as well as a 10 to 15–foot blood trail from the victim's head, and, at one point, a view of the gunshot wound to the victim's head. Appellant argues that the trial court erred in allowing the Commonwealth to introduce the tape because it was both inflammatory and unnecessary to the presentation of the Commonwealth's case, particularly because Durrant had confessed to the shooting, and the only issue was whether Appellant was an accomplice or conspirator to the shooting.

The Commonwealth, however, maintains that the videotape, while graphic, was both relevant and probative, in that it corroborated Durrant's testimony that the victim's murder was premeditated and intentional. With regard to the blood trail, the Commonwealth argues "it is not readily apparent that what was depicted was blood as it appeared dark colored and not crimson red. Nor was the trail shown for a lengthy period of time." Commonwealth's Brief at 4. The Commonwealth further contends, "[w]hile the video provided, at one point, a view of the gunshot wound to the head, this was shown for less than a second and was not readily apparent. No testimony was presented that [Appellant] played a role in where or how the shooting would occur." *Id.*

The admissibility of photographic evidence depicting a crime scene is within the sound discretion of the trial court, and the trial court's ruling will be reversed only upon an abuse of that discretion. *Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 726 (1998). In determining whether to admit a

photograph or videotape of a murder victim, a trial court must engage in a two-step analysis. *Commonwealth v. Pruitt*, 597 Pa. 307, 951 A.2d 307, 319 (2008). First, the court must determine whether the photograph is inflammatory. If it is not, the photograph may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the court must determine whether the essential evidentiary value of the photograph outweighs the likelihood that the photograph will improperly inflame the minds and passions of the jury. *Id.*

In admitting the videotape in the instant case, the trial court noted that it had reviewed and admitted into evidence the same videotape during the trial of Appellant's co-conspirator, Cruz. N.T. Trial, 5/17/10, at 135. In its opinion addressing Appellant's post-trial motions, the trial court further noted that Cruz raised the same claim in his appeal to the Superior Court, and the Superior Court determined Cruz was not entitled to relief because the images contained in the video were not inflammatory, and because "the video and photographs did provide the jury with a view of the murder scene, which was relevant in light of the Commonwealth's case that [Cruz] and Durrant had planned to ambush Sawyer, and that [Cruz] had deliberately led Sawyer to the site at which Durrant ultimately accomplished the attack." Opinion and Order, 1/18/12, at 15 (quoting *Commonwealth v. Cruz–Echevarria*, 1930 MDA 2008, at 18 unpublished memorandum, 26 A.3d 1178 (Pa.Super. filed 3/4/11)). The trial court opined that, because the issue of whether Appellant conspired with or was an accomplice to the shooting of Sawyer is "identical to the issue decided in the Cruz case; ... the Court believes that the Commonwealth's use of the same video and its evidentiary value is *res judicata* and was properly admitted by this Court." Opinion and Order, 1/18/12, at 15–16.

This Court has reviewed the videotape, and we agree with the trial court's determination that it was not inflammatory. The videotape did show the victim's body, but it only showed the victim's head for a few seconds, and the entirety of the footage was dark and grainy. Due to the quality of the

videotape, it is also unlikely a juror would have been able to identify the blood trail simply by looking at the videotape. Moreover, the camera constantly panned the area, and did not focus on any one area or item for an extended period of time. Furthermore, we agree with the trial court and the Commonwealth that the videotape was relevant to provide the jury with a view of the crime scene and to assist the jury in its understanding of the Commonwealth's theory that Durrant and Cruz led the victim into the alleyway to ambush him. *See Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767, 776–77 (2004) (graphic, even inflammatory, photographs of murder victims are relevant and admissible to demonstrate and prove specific intent to kill). Accordingly, as the videotape was not inflammatory, and was relevant in that it assisted the jury's understanding of the facts, we hold the trial court did not err in admitting the tape into evidence.

## C. *Evidence of Durrant's prior bad acts*

Appellant next argues the trial court erred in denying his motion to introduce evidence of prior bad acts by Durrant in order to show Durrant's bias and motive for testifying against Appellant. Specifically, Appellant sought to introduce taped conversations Durrant had while he was in prison. In one of the conversations, Durrant "asked his [ten-year-old] son to stab an individual by the name of Mike, who [was] allegedly sleeping with Durrant's wife." Appellant's Brief at 19–20. Appellant also sought to introduce evidence that Durrant had made statements indicating that, while he was incarcerated in Clinton County, he threw scalding water on another inmate, as well as evidence that Durrant assaulted a fellow inmate while he was incarcerated in Lycoming County. According to Appellant, "[t]he purpose of introducing these items was to show that [Durrant] believed he could do anything and it showed bias on his part," and to demonstrate that Durrant "had a reason to cooperate with the Commonwealth for the reason that he would seek favorable treatment in regards to these incidents." *Id.* at 20.

 The admission of evidence of prior bad acts is solely within the discretion of the trial court, and the court's decision will not be disturbed absent an abuse of discretion. *Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501, 534 (2005). As we explained in *Chmiel*,

It is a long-standing principle in this Commonwealth that evidence of a distinct crime, except under special circumstances, is inadmissible. Permissible use of evidence of other crimes is addressed in Pa.R.E. 404(b), which states, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith" but "[e]vidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Additionally, the veracity of a witness may not be impeached by prior arrests which have not lead to convictions. Pa.R.E. 608(b) precludes the admission of specific instances of misconduct to attack a witness' character for truthfulness while Pa.R.E. 609(a) requires an actual conviction of a crime involving dishonesty or false statement in order for a witness's credibility to be attacked with evidence of the crime.

*Id.* at 534–35 (citations omitted).

In the case *sub judice,* the alleged prison incidents involving Durrant did not involve convictions for crimes of dishonesty or false statements, and did not result in convictions; thus, they were inadmissible as prior bad acts evidence under Pa.R.E. 608(b) and 609. For this same reason, evidence regarding Durrant's telephone call with his son also was inadmissible as prior bad acts evidence. Appellant maintains, however, that the trial court should have allowed him to introduce evidence of Durrant's alleged behavior in prison and his telephone call with his son in order to demonstrate to the jury that Durrant cooperated with the Commonwealth so that he could obtain favorable treatment with regard to the incidents. Appellant relies on *Commonwealth v. Evans,* 511 Pa. 214, 512 A.2d 626 (1986), wherein this Court held:

whenever a prosecution witness may be biased in favor of the prosecution because of outstanding criminal charges or because of any non-final criminal disposition against him within the same jurisdiction, that possible bias, in fairness, must be made known to the jury. Even if the prosecutor has made no promises, either on the present case or on other pending criminal matters, the witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution. And if that possibility exists, the jury should know about it.

*Id.* at 631–32.

In explaining its reasons for denying Appellant's motion to introduce evidence of Durrant's conversation with his son, the trial court stated:

Defense Counsel alleges that the conversation shows Durrant's anger about people being around his wife while he is in jail, and shows that Durrant is a jealous person and reacts angrily to that jealously (sic).

After listening to argument by both parties . . . , the Court determined that introducing the statements relating to people Nicole Durrant was or was not sleeping with were not relevant in the trial for Sawyer's murder, and were therefore precluded. However, as Durrant had previously testified that he did something to Mike while Mike was in the county prison, the Court also determined that if Defense Counsel could establish that Durrant was actually talking about Mike in the tapes, then the Court would allow questioning as to Durrant's communications about Mike.

Opinion and Order, 1/18/12, at 17–18 (record citations omitted). With regard to evidence of Durrant's misconduct in prison, the trial court explained:

the Court stated that it was not made aware of any disciplinary action involving Durrant in the Lycoming County Prison, and that if such misconduct occurred, the Court would have been made aware. The Commonwealth also indicated that they had not received information about the alleged incidents from either prison, and that they had not

had any conversations with the Warden at either prison regarding the disciplinary actions against Durrant. As the Court found no factual basis to support Defense Counsel's allegations of disciplinary actions involving Durrant in prison, the Court determines that its decision to preclude questioning on these matters at trial was appropriate.

*Id.* at 18 (record citations omitted).

 Appellant fails to offer any evidence to rebut either the trial court's statement that it was unaware of any disciplinary action taken against Durrant for incidents which occurred in prison, or the Commonwealth's representation that it had not received any information regarding the alleged prison incidents. Thus, there was no foundation for the evidence Appellant sought to introduce, and Appellant is not entitled to relief under *Evans.*

D. *Expert testimony regarding eyewitness identification*

 Next, Appellant contends the trial court erred in denying him the opportunity to present expert testimony regarding eyewitness identification in order to challenge the testimony of Marion Diemer, a known drug addict, that Appellant was the individual to whom Gregory Ricks traded the stolen shotgun for drugs. Expert testimony is admissible only where the formation of an opinion on a subject requires knowledge, information, or skill beyond that possessed by the average juror. *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 630–31 (1995). Expert testimony is inadmissible where it would encroach upon the jury's task of determining witness credibility. *Id.* at 631.

In his brief to this Court, Appellant cites the United States Supreme Court's decision in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), wherein the high Court indicated that the following factors should be considered in evaluating the likelihood of misidentification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of

certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at 199–200, 93 S.Ct. 375.

■ Appellant argues that, in accordance with *Biggers*, expert testimony was necessary to enable him to challenge the accuracy of Diemer's identification based on the fact that she had only a short time to view Appellant, was under the influence of drugs at the time, and had never been involved in the sale of a gun. Specifically, Appellant asserts:

> In the present case, only an expert could develop the ability of this witness to recall the events clearly. The average person does not know how another person reacts in the presence of the sale of a gun when they have never done it before. The stress factor could only be explained by an expert.
>
> And finally, the average person could not judge the ability of a person to recall the events that occurred when they were in a drug-induced state for several days. This is not information that the average individual would be able to judge without special knowledge or information. Only an expert with special knowledge and training could evaluate a person's ability to recall a person over one year later.

Appellant's Brief at 25.

We conclude Appellant's claim that the trial court erred in precluding him from presenting expert testimony to discredit Diemer's testimony is meritless, and that Appellant's reliance on *Biggers* is wholly misplaced. In *Biggers*, the challenged identification was made by the *victim* of the rape with which the defendant was charged, and the high Court ultimately determined there was no substantial likelihood of misidentification. Herein, the identification on which Appellant claims expert testimony was necessary was made by a witness who was voluntarily engaged in the sale of a gun, not by a witness who was the victim of a crime.

Furthermore, we note that, as was the case in *Simmons*, during cross-examination, Appellant was free to, and did, challenge the witness's credibility and identification of Appel-

lant based on, *inter alia*, the fact that the witness had not previously been involved in the sale of a firearm and was under the influence of drugs. Accordingly, we hold the trial court did not err in refusing Appellant's request to present expert testimony as to the effect of "gun sale stress" on eyewitness identification in the instant case.

E. *Evidence of another party's motive to commit the crime*

Appellant next argues that the trial court denied him his due process rights by preventing him from calling two witnesses to testify about another party's motive to commit the crime. Specifically, Appellant claims that he intended to call Ashley Duplanti–McGrath ("Duplanti"), who would have testified that her husband, Michael McGrath ("McGrath"), owed the victim $1500 for crack cocaine, and that, in February 2007, the victim and two other individuals approached Duplanti and McGrath with handguns, threatened them, and took Duplanti's car keys. On a subsequent day, the three men took Duplanti's car. In March 2007, McGrath began serving a jail sentence, and, one day after he was incarcerated, the victim forced Duplanti to sign a paper authorizing the victim to take possession of her vehicle. When McGrath learned of this latest incident, he stated that he was going to get the victim when he got out of prison.

Appellant also claims the trial court erred in precluding the testimony of Holly Derk, who would have testified that another individual, AB, had a motive to kill the victim. Appellant made the following proffer at trial:

[Derk] would [testify] that she was confronted by "AB" along with a friend, and he was looking for [the victim] and threatening to get him. Indicated he was a member of the "Bloods" and he wanted to get him. She would also testify that she was burglarized several days before that incident. She would testify that ... Sawyer would spend three, four days at a time at her house, sometimes a week at a time, and they were burglarized within that three, four days. Subsequent to that she believed that "AB", who is Ron Posey, was selling items from her home. She did make a

police report of this, and it is our position, Your Honor, it shows that "AB" was [sic] not only had a reason to go after Mr. Sawyer, he was going after Mr. Sawyer, and because Mr. Durrant had said he was getting information from "AB" through another person at the jail, there is—there's the motive of "AB" and he's getting information to Durrant.

N.T. Trial, 5/21/10, at 6–7.

The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. *Commonwealth v. Travaglia*, 611 Pa. 481, 28 A.3d 868, 873 (2011). A defendant has a fundamental right to present evidence, so long as the evidence is relevant and not subject to exclusion under our Rules of Evidence. *Commonwealth v. McGowan*, 535 Pa. 292, 635 A.2d 113, 115 (1993). Evidence is relevant if it tends to prove or disprove some material fact, or tends to make a fact at issue more or less probable. *Id.* With regard to Duplanti's proffered testimony, the trial court determined it was not relevant because McGrath had threatened to harm the victim when McGrath got out of prison, but the victim actually was murdered while McGrath was still incarcerated. The trial court further observed that Appellant offered no evidence to connect McGrath either to the victim's murder, or to Cruz or Durrant. We find no abuse of discretion by the trial court in excluding Duplanti's testimony.

It is well established that evidence which tends to show that the crime with which a defendant is charged was committed by someone else is relevant and admissible. *McGowan*, 635 A.2d at 115. In this regard, we recently explained that "the defense may introduce evidence that someone else committed a crime which bears a highly detailed similarity to the crime with which a defendant is charged." *Commonwealth v. Weiss*, 622 Pa. 663, 81 A.3d 767, 806–07 (2013) (citation omitted). Herein, Appellant offered no evidence to suggest that McGrath was charged, let alone convict-

ed, of a crime that bore substantial similarity to those with which Appellant was charged.

With respect to the proffered testimony of Derk, the Commonwealth contends Appellant has waived this challenge by failing to raise it in his Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b). In this regard, we note that Appellant does not list his claims in a single document. Rather, in a one-page "Concise Statement of Matters Complained of on Appeal," Appellant indicates that he is raising on appeal "issues that were denied and specifically set forth" in his two omnibus pretrial motions, and in his motion for post sentence relief, and attaches copies of those documents. Rule 1925(b) Statement, 7/10/12, at 1. Likewise, the trial court does not address Appellant's claims in a single opinion, but, rather, in what is labeled an "Opinion in Support of Order in Compliance with Rule 1925(a)," states "[f]or purposes of this Opinion, the Court will rely on Judge Butts' Opinions and Orders filed on July 16, 2009; October 30, 2009; and January 18, 2012." Rule 1925(a) Opinion, 8/1/12, at 2. We have reviewed all of these filings and observe that Appellant failed to raise the issue regarding the trial court's denial of Derk's proposed testimony in any of them. Thus, the Commonwealth is correct that Appellant has waived this claim.

## F. *Admission of alleged hearsay testimony*

Appellant next alleges the trial court erred in allowing the Commonwealth to introduce "double hearsay testimony of a phone conversation, which took place on March 31, 2007, where Kendra Burrage was talking to Nicole Durrant [regarding statements purportedly made by Sean Durrant] and then repeating what Nicole said back to the Appellant." Appellant's Brief at 32. At one point during the conversation, after Burrage told Appellant that Durrant was going to be "taking the rap" for the murder of the victim, Appellant told Burrage he was "feeling better." N.T. Trial, 5/24/10, at 66. At another point during the conversation, Burrage told Appellant that Nicole Durrant said "it was supposed to be over either him

testifying or going after somebody or something." Appellant's Brief at 33.

Appellant contends this latter statement constituted hearsay because the theory of the Commonwealth's case was that Durrant killed the victim because he was afraid the victim would testify against him, as evidenced by the following portion of the Commonwealth's closing argument:

> Mr. Durrant is telling us that Mr. Patterson is lying to him, right? He's telling him that Eric Sawyer is a snitch. He's gone to the police. He's going to provide information about our organization. Mr. Durrant said that he was worried because Eric Sawyer had been to his house twice already. He didn't know what kind of information they were going to provide either about him or the organization. So this is all just about Mr. Patterson continuing his lie. He's feeding in to Mr. Durrant's worries that Eric Sawyer is a snitch.

N.T. Trial, 5/25/10, at 78. Appellant further argues:

> [a]lthough not specifically stated in Appellant's objection, he was denied his right to be confronted by witnesses against him under the Sixth Amendment of the United States Constitution and Article I Section 9 of the Pennsylvania Constitution. Neither of the witnesses [Burrage or Nicole Durrant] testified at trial and the Commonwealth entered this tape without the Appellant's ability to cross-examine any witnesses.

Appellant's Brief at 34.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). In response to Appellant's claim that the trial court erred in allowing it to introduce into evidence Burrage's statement to Appellant regarding Nicole Durrant's comment, the Commonwealth first asserts that, because Appellant did not object to this portion of the prosecutor's closing argument, his argument is waived. The Commonwealth further contends that the statement at issue related to Durrant's testimony that

the victim was a snitch, not to Burrage's repetition of Nicole Durrant's statement. Commonwealth's Brief at 14–15.

We hold that Appellant is not entitled to relief. First, as noted by the Commonwealth, Appellant did not object to the above-quoted portion of the prosecutor's closing argument. Therefore, he has waived any claim related thereto. *Commonwealth v. Sanchez*, 623 Pa. 253, 82 A.3d 943, 969–70 (2013) (in order to preserve for appellate review an objection to the opening or closing argument of opposing counsel, the objection must be specific and brought to the attention of the trial court as soon as practical). Moreover, upon review of the prosecutor's closing argument, it is clear that the prosecutor was referring to Durrant's testimony, not to the alleged hearsay statement of Burrage, in order to prove its theory that Durrant killed the victim because he was afraid the victim would testify against him. Accordingly, Appellant is not entitled to relief on his hearsay claim.

### G. *Testimony of Jesse James*

Appellant sought to introduce at trial the testimony of Jesse James, who was incarcerated at the same time as Durrant at the Lycoming County Prison. According to Appellant, James would have testified that Durrant asked him for assistance in obtaining the jury list for Durrant's trial. James, however, reported this to his own attorney, and wrote a letter advising the public defender about Durrant's alleged request, which was then sent to the District Attorney's office. Appellant argued that James' testimony was relevant to demonstrate that Durrant was so intent on obtaining a favorable deal that he was willing to engage in jury tampering, and "would have done anything including make up a story to cooperate with the Commonwealth." Appellant's Brief at 38.

In prohibiting James' testimony, the trial court concluded it was not relevant, as no jury member was ever contacted, let alone threatened, by Durrant. Appellant, however, contends "[t]he fact that [Durrant] contacted or didn't contact the jury member is of no consequence, it is the fact that he was

attempting or at least contemplating such action that is relevant for the jury to decide concerning whether or not [Durrant] has bias or motive." *Id.* at 38. In support of his argument, Appellant notes that this Court, in *Commonwealth v. Robinson*, 507 Pa. 522, 491 A.2d 107 (1985), held that a witness may be cross-examined for the purpose of showing a motive to give false testimony.

We reiterate that the decision to admit or exclude evidence is within the discretion of the trial court, and will not be reversed absent an abuse of that discretion. *Commonwealth v. DeJesus*, 584 Pa. 29, 880 A.2d 608, 614 (2005). Relevant evidence is "any evidence that tends to make a fact in issue more or less probable, and the relevance of a given piece of evidence is a prerequisite to its admissibility." *Id.* Relevant evidence may be excluded, however, if such evidence poses a danger of unfair prejudice that outweighs its probative value, and a trial court's evidentiary error may be deemed harmless where an appellate court is convinced, beyond a reasonable doubt, that the error could not have contributed to the verdict. *Id.*

Initially, Appellant fails to explain how Durrant's alleged attempt to obtain the jury list is relevant to establish that Durrant had a motive to give false testimony. Moreover, even assuming James' testimony was relevant to show that Durrant was willing to "do anything" to cooperate with the Commonwealth, as Appellant suggests, we are convinced the trial court's exclusion of James' testimony did not affect the jury's verdict. Indeed, as the Commonwealth notes, Appellant introduced substantial evidence at trial demonstrating that Durrant had a motive to fabricate his testimony in order to obtain a favorable plea agreement. During a thorough cross-examination, Durrant admitted that he initially lied about his participation and the involvement of others in the victim's murder. N.T. Trial, 5/19/10, at 127–42. Appellant also established that, in exchange for Durrant's testimony, the Commonwealth agreed to drop the charges of first-degree murder and conspiracy to commit first-degree murder and sentence Durrant for third-degree murder. Durrant further admitted that he

withheld evidence until pending motions in his own case were resolved; that his main objective was to obtain the best deal possible; and that, at one point, he stated he was going to claim that his trial counsel was ineffective. In light of the abundant evidence introduced by Appellant regarding Durrant's motive to provide false testimony, the testimony of James, even if relevant, would have been cumulative; thus, we hold Appellant is not entitled to relief based on the trial court's exclusion of James' testimony.

H. *Cross-examination of Appellant about song lyrics*

Appellant next argues that the trial court erred when it permitted "highly prejudicial irrelevant cross examination" of Appellant regarding a song titled "Homeboyz," written by Tupac Shakur. Appellant's Brief at 40. As discussed *supra,* the Commonwealth introduced into evidence the March 25, 2007 letter that Appellant sent to Cruz and Durrant from prison, which, *inter alia,* contained the phrase "When I give the word tear that ass out of that frame." Durrant testified that the phrase "tear the ass out of that frame" meant "killing Eric Sawyer, you know, making-wiping him out and getting rid of him." N.T. Trial, 5/19/10, at 66. When Appellant took the stand in his defense, Appellant's counsel asked him about the origin and meaning of the phrase "tear the ass out the frame." Appellant testified the phrase came from a Tupac Shakur song, and stated:

> [I]n the drug game, tear that ass out of the frame means, listen, whoever's out there that's moving anything this is what we going to do, bigger, better product, better quality, you know what I mean? That mean, don't nobody else make no more money. That means everything that we put out from here on out is going to be top quality. That tears everybody ass out the frame. That means nobody else is getting anything but us.

N.T. Trial, 5/21/10, at 142.

On cross-examination, the Commonwealth presented Appellant with a copy of the lyrics of the song[13] with certain

13. While we do not reproduce the lyrics in their entirety, the phrase at issue appears in the following stanza:

portions, including the phrase "tear the ass out the frame" highlighted. At this point, Appellant denied previously seeing or hearing the song or the album on which the song was included, and Appellant's counsel objected to further questioning regarding the song. The trial court sustained the objection and prohibited the Commonwealth from questioning Appellant about the majority of the song's lyrics; however, the court granted the Commonwealth latitude to question Appellant regarding the phrase "tear the ass out the frame," which Appellant had identified as a lyric from the Tupac Shakur song. The following exchange then occurred:

Q: You would agree with me that that would be—those are lyrics from the song Homeboyz, but Tupac Shakur uses the phrase tear the ass out the frame in that song?

A: Well, I don't know what song it's from. I never heard that song before. I never—

Q: My question for you first is, would you agree with me that Tupac Shakur uses the phrase tear the ass out the frame in this song, Homeboyz?

A: That I just read?

Q: Yeah?

A: Yeah.

Q: And after reading the lyrics you would agree with me that that, in fact, in that song Tupac Shakur is not singing about drugs he's singing about killing people?

Defense Counsel: I would object, Your Honor.

Court: I will overrule the objection.

Q: He's not singing about drugs in that song he's singing about killing people, right?

A: I suppose. I only read what you highlighted so I didn't go through the whole song.

 Nigga, it's a goddamn shame, somebody explain
 Why they sent a Bad Boy to play a grown man's game
 Tear that ass out the frame, completely get that ass kicked
 Woke up on the street but you'll be sleepin' in the casket
 http://www.lyrics.com/homeboyz-lyrics-2pac.html.

Q: You can read the rest of the song if you want, but that's what it's about, right?

A: Yes, sir.

N.T. Trial, 5/24/10, at 138–39.

Appellant argues that the trial court erred in allowing him to be cross-examined about the song lyrics because (1) the song lyrics were not relevant; and (2) admission of the lyrics was highly prejudicial and outweighed any probative value of the evidence. We find no merit to Appellant's argument.

As discussed *supra*, relevant evidence is any evidence that tends to make a fact in issue more or less probable. *DeJesus*, 880 A.2d at 614. Appellant argues the song lyrics were not relevant in light of his testimony that he was unfamiliar with the song. However, as noted by the Commonwealth, such a claim goes to the weight of the evidence, and a witness's credibility is for the finder of fact. Thus, it was for the jury to determine whether they believed Appellant's statement that he was not familiar with the lyrics. Moreover, to the extent Appellant contends that his cross-examination regarding the lyrics was "highly prejudicial," as this Court has observed, most relevant evidence is, in fact, prejudicial. Appellant fails to establish that his cross-examination regarding the phrase "tear the ass out the frame" was unduly prejudicial, particularly where Appellant testified that the phrase came from a Tupac Shakur song, but was unable to identify any other Tupac Shakur song that contained the same lyric.

I. *Trial court's denial of motion to suppress statement Appellant made while in prison*

Appellant next argues that the trial court erred in denying his motion to exclude the statement he made to police, wherein he admitted that he authored the March 25, 2007 letter to Durrant and had another inmate write the letter for him, during an interview on May 22, 2008, when he was incarcerated at SCI–Smithfield. In reviewing a challenge to a suppression ruling,

[w]e determine whether the court's factual findings are supported by the record and whether the legal conclusions drawn from them are correct. Where, as here, it is the defendant who is appealing the ruling of the suppression court, we consider the evidence of the prosecution and so much of the evidence for the defense which remains uncontradicted when fairly read in the context of the whole record. If, upon our review, we conclude that the record supports the factual findings of the suppression court, we are bound by those facts, and may reverse only if the legal conclusions drawn therefrom are in error.

*Pruitt*, 951 A.2d at 317 (citation omitted).

 Appellant claims that his statement should have been suppressed because he did not voluntarily waive his *Miranda* rights. In determining whether a defendant's waiver of his *Miranda* rights is valid, a trial court must consider: (1) whether the waiver was voluntary, in the sense that the waiver was not the result of governmental pressure; and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice. *Pruitt*, 951 A.2d at 318. The Commonwealth bears the burden of establishing that a defendant knowingly and voluntarily waived his *Miranda* rights. *Id.* Factors to be considered in determining whether a waiver is valid and a confession is voluntary include: the duration and means of interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any other facts which may serve to drain one's powers of resistance to suggestion and coercion. *Commonwealth v. Perez*, 577 Pa. 360, 845 A.2d 779, 787 (2004).

Although Appellant acknowledges the trial court considered the duration of the interview, he contends that the trial court failed to consider other relevant factors in determining whether his statement was voluntary, including the fact that (1) Appellant was incarcerated at the time of his statement; (2) Appellant was "brought down in an extremely small room with

a detective, a captain, two guards, and two other officers"; (3) Appellant initially believed he was dealing with the public defender; (4) Appellant was advised he was being implicated in a murder; (5) the detectives talked about Appellant's fiancée; and (6) Appellant was confronted with more than 100 documents and numerous CDs. Appellant's Brief at 50. According to Appellant, these circumstances "resulted in a coercive situation that compelled [him] to co-operate [sic] notwithstanding *Miranda* warnings." *Id.*

In denying Appellant's motion to suppress and holding that his waiver of his *Miranda* rights was valid, the trial court reasoned:

> The testimony of [Agent Leonard] Dincher was that [Appellant] was alert and aware of the nature of their investigation. Dincher and [Captain Raymond] Kontz both explained that contrary to [Appellant's] assertions, after introductions, and prior to any questioning, he was advised of his *Miranda* rights, understood those rights and agreed to talk. Dincher also explained that while the interview lasted almost four hours, [Appellant] was given a break for lunch. Dincher testified the interview was relaxed, [Appellant's] demeanor was cordial and laid back. Finally, Dincher explained that [Appellant] appeared to understand all of the questions and never asked for an attorney. As the Court finds the testimony of Dincher and Kontz to be credible; the Court further finds [Appellant] was not coerced but rather made the waiver of his *Miranda* rights knowingly intelligently, and voluntarily.

Opinion and Order, 7/16/09, at 12. Thus, the trial court considered all of the relevant factors to determine whether Appellant's waiver was voluntary, including the attitude and demeanor of Agent Dincher, Captain Kontz, and Appellant. In this regard, the trial court found the testimony of Agent Dincher and Captain Kontz regarding the atmosphere and tone of the interview credible. The mere fact that the room was small, or that the detectives mentioned Appellant's fiancée and showed him a number of documents does not render the conditions of the interview coercive. Thus, we conclude Ap-

pellant's claim is without merit, and hold that the trial court did not err in refusing to suppress statements made by Appellant during the interview.

### J. *Appellant's attempt to refresh the recollection of a witness*

At trial, Appellant sought to call Douglass Shaheen as a witness. According to Appellant, Shaheen previously worked as a confidential informant, and, at one point, provided information to a state trooper ("Trooper Clark") about an individual, "AB", who allegedly was involved in the victim's murder. Appellant sought to introduce this testimony to show that the police had information that another individual was involved in the murder, but failed to follow up on such information. Prior to testifying, however, Shaheen indicated that he did not recall speaking with Agent Dincher, and did not recall "what he said to Trooper Clark." N.T. Trial, 5/21/10, at 55. Appellant thus sought permission to refresh Shaheen's recollection as to what he told Trooper Clark by playing for the jury a videotape of Shaheen's statement to Trooper Clark, notwithstanding Appellant's acknowledgement that "much of the information on the taped interview was about other individuals which would not be relevant and the information about 'AB' would be hearsay if played." Appellant's Brief at 51. Notably, the transcript does not indicate whether the videotape had been played for Shaheen outside of the presence of the jury, and reveals no request by counsel to have the videotape played outside the presence of the jury.[14]

The trial court refused to allow the defense to play the videotape in front of the jury on the basis that "if Shaheen had no memory of his conversations, the Court could not allow the Defense to play the video tapes, and therefore Shaheen was not needed as a witness." Trial Court Opinion, 1/18/12,

14. Likewise, Appellant fails to identify where in the record his request to play the videotape outside the presence of the jury to refresh Shaheen's recollection appears. Thus, to the extent Appellant now argues that he should have been permitted to play the videotape outside the presence of the jury, but was not permitted to do so, he has waived such claim.

at 40. Appellant argues that he should have been permitted to refresh Shaheen's recollection of his conversation with Trooper Clark by playing the recorded interview pursuant to Pennsylvania Rule of Evidence 803.1(3). Appellant further suggests, "[i]f the Court truly believed that some of the information was not admissible it either could have been redacted or Mr. Shaheen could have been given the tape to refresh his recollection outside of the presents [sic] of the jury but in the present case Appellant believes it was appropriate even in front of the jury." Appellant's Brief at 53.

Rule 803.1(3) provides:

**(3) Recorded Recollection of Declarant–Witness.** A memorandum or record made or adopted by a declarant-witness that:

(A) is on a matter the declarant-witness once knew about but now cannot recall well enough to testify fully and accurately;

(B) was made or adopted by the declarant-witness when the matter was fresh in his or her memory; and

(C) the declarant-witness testifies accurately reflects his or her knowledge at the time when made.

If admitted, the memorandum or record may be read into evidence and received as an exhibit, but may be shown to the jury only in exceptional circumstances or when offered by an adverse party.

Pa. R.E. 803.1.

As the Commonwealth highlights, the trial court did not preclude the defense from attempting to refresh the witness's recollection with the videotape; rather, it prohibited the playing of the tape in front of the jury, which is consistent with Rule 803.1. Thus, we find no error in the trial court's refusal to allow Appellant to refresh Shaheen's recollection by playing a videotape in front of the jury.

### K. *"Life means life" instruction*

Appellant next argues that the trial court erred in failing to instruct the jury as to the definition of life imprison-

ment "at all levels of the trial." Appellant's Brief at 54. In *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the high Court held that a trial court must instruct the jury as to the meaning of a life sentence when the Commonwealth puts a defendant's future dangerousness at issue *and* a specific request is made by the capital defendant. *Commonwealth v. Wright*, 599 Pa. 270, 961 A.2d 119, 146 (2008) (where Commonwealth injects a defendant's future dangerousness into a sentencing hearing, and a defendant makes a request, defendant is entitled to instruction informing jury that life in prison means life without parole). However, a "*Simmons* instruction need not be given unless the Commonwealth injects the defendant's future dangerousness into the sentencing hearing." *Wright*, 961 A.2d at 146. Moreover, a *Simmons* instruction is not required based upon mere references to a defendant's past violent acts alone. *Commonwealth v. May*, 551 Pa. 286, 710 A.2d 44, 47 (1998).

Appellant acknowledges that the trial court provided the jury with a "life means life" instruction during the penalty phase of trial in accordance with *Simmons*. Appellant maintains, however, that the court "erred by not allowing this instruction during jury selection, the guilt[ ] phase as well as the penalty phase of the trial." Appellant's Brief at 54. According to Appellant:

> [s]tudies have shown that juries begin to form opinions about the imposition of the death penalty beginning with the voir dire process and form opinions as to the penalty during the guilt phase of the trial. Prospective jurors believe that a sentence of life imprisonment is in fact a sentence which allows for a parole after a finite period of years substantially less than life. In the absence of an instruction to the jury as to the definition of "life imprisonment", Appellant submits that the jury selected was predisposed to the sentence of death as opposed to a life sentence because they erroneously believed a life sentence resulted in less than lifetime of imprisonment. Such predisposition deprived Appellant of his right to a fair and impartial jury trial.

*Id.* at 54–55. Thus, notwithstanding the trial court's compliance with existing precedent, Appellant "urges this Honorable Court to review this issue in light of the patently obvious future dangerousness argument that was going to be made by the [C]ommonwealth." *Id.* at 55. We reject Appellant's argument.

It is well settled that a *Simmons* instruction is required only where the Commonwealth places a defendant's future dangerousness at issue during the penalty phase of trial. *Wright, supra; Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167 (1999); *May, supra.* Even if we were inclined to extend the requirement of a *Simmons* instruction to the guilt phase of trial, as Appellant urges us to do, Appellant fails to establish that the Commonwealth placed his future dangerousness at issue during the guilt phase. Thus, despite his contention that he has met both prongs of *Wright,* we find no error in the trial court's refusal to provide the jury with a *Simmons* instruction during the guilt phase of Appellant's trial.

### L. *Unconstitutionality of death penalty*

Finally, acknowledging that the trial court followed existing case law in denying his pretrial motions challenging the death penalty on the basis of the Eighth and Fourteenth Amendments to the United States Constitution, Appellant urges this Court to hold the death penalty is unconstitutional when applied to defendants who are convicted of murder based on co-conspirator or accomplice liability. The Commonwealth responds that Appellant has waived this specific argument by failing to include it in his 1925(b) statement, or in his pre- or post-trial motions. *See* Pa.R.A.P. 1925(b); *Commonwealth v. Laird,* 605 Pa. 137, 988 A.2d 618, 643 n. 27 (2010) (constitutional claims not raised in 1925(b) statement are waived).

We agree with the Commonwealth that Appellant has waived this challenge to Pennsylvania's death penalty statute by failing to raise the issue before the trial court. Moreover, in his brief to this Court, Appellant fails to cite any case law, or offer substantive argument, to support his contention that the trial court "should have distinguished [his] case as a co-

conspirator and determined the Death Penalty to be cruel and unusual punishment." Appellant's Brief at 56–57. Thus, Appellant's argument is waived on this basis as well.

### M. *Statutory review of death penalty verdict*

Having determined that Appellant's conviction for first-degree murder is supported by the evidence, and that he is not entitled to relief on his claims, we must affirm the death sentence unless we determine that: (1) the sentence was the product of passion, prejudice, or any other arbitrary factor, or (2) the evidence does not support the finding of at least one aggravating circumstance. 42 Pa.C.S.A. § 9711(h)(3). Based on our review of the record, we conclude the sentence was based on the properly-admitted evidence that Appellant conspired with Cruz and Durrant to kill the victim, and, indeed, that Durrant waited for the "go-ahead" from Appellant before shooting the victim, and, thus, was not the product of passion, prejudice, or any other arbitrary factor. Furthermore, as the Commonwealth introduced evidence of Appellant's certified record of conviction, indicating that Appellant was convicted on August 21, 1997 of third-degree murder in Philadelphia, for which he was sentenced to 8½ to 20 years incarceration, we find the evidence was sufficient to support the jury's finding of the aggravating factor that Appellant had a prior felony conviction for third-degree murder.

For the foregoing reasons, we affirm Appellant's judgment of sentence. The Prothonotary of this Court is directed to transmit the complete record of this case to the Governor of Pennsylvania in accordance with 42 Pa.C.S.A. 9711(i).

Chief Justice CASTILLE and Justices SAYLOR, EAKIN, BAER, TODD, McCAFFERY and STEVENS join the per curiam opinion.