J-A28028-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| IZEK TUGGLE | |
| Appellant | No. 218 EDA 2014 |

Appeal from the Judgment of Sentence of December 16, 2013
In the Court of Common Pleas of Montgomery County
Criminal Division at No.: CP-46-CR-0006944-2011

BEFORE: GANTMAN, P.J., WECHT, J., and JENKINS, J.

MEMORANDUM BY WECHT, J.:                    **FILED NOVEMBER 21, 2014**

Izek Eugene Tuggle appeals his December 16, 2013 judgment of sentence, which was imposed following a nonjury trial that resulted in Tuggle being found guilty of: person not to possess a firearm, attempting to obtain a controlled substance (Percocet) by fraud, manufacture of a controlled substance (marijuana), possession of marijuana with intent to deliver, and possession of Percocet with intent to deliver.[1] We affirm.

In 2011, Tuggle was the target of an investigation into the distribution of controlled substances and usage of fraudulent medical prescriptions in Montgomery County. The Montgomery County Detective Bureau gathered

---

[1] **See** 18 Pa.C.S. §§ 6105(a)(1), and 901 (35 P.S. § 780-113(a)(12)); and 35 P.S. § 780-113(a)(30), respectively.

information about Tuggle through confidential informants, reports from other police departments, surveillance, and controlled purchases of controlled substances. Based upon the probable cause established by this information, police applied for and received a search warrant for Tuggle's residence on August 18, 2011. Upon the execution of that warrant and the recovery of evidence obtained therefrom, Tuggle was arrested and charged with, *inter alia*, the above-referenced crimes. Prior to his trial, Tuggle filed a motion to suppress a statement that he provided after his arrest, and the trial court held a hearing on Tuggle's motion on July 15, 2013.

The trial court has summarized the relevant facts and detailed the testimony provided at Tuggle's suppression hearing as follows:

> During the course of [Tuggle's] suppression hearing, Detective [James] Vinter testified that, on August 19, 2011, at approximately 6:20 a.m., he participated in the execution of a search warrant at [Tuggle's] apartment on Corson Street in Norristown, Montgomery County, Pennsylvania. Various items were discovered during this search, including: Percocet, marijuana, blank prescription pads, and a handgun. [Tuggle] was immediately taken into custody and was transported to the headquarters of the Montgomery County Detectives, arriving there at approximately 8:30 a.m., and was taken to a "holding facility" within the building.
>
> Detective Vinter testified that, at some point—either at the Corson Street apartment or in the holding facility—he engaged [Tuggle] in a very brief conversation, during the course of which he asked [Tuggle] if he wanted to cooperate and give a statement. The detective testified that [Tuggle] replied that he did want to make a statement. The detective described [Tuggle] as being "very cooperative at that time."

On cross-examination by [defense counsel], Detective Vinter readily acknowledged that he had not informed [Tuggle] of his rights under **Miranda v. Arizona**[2] prior to asking [Tuggle] if he was willing to cooperate with the police. Detective Vinter further acknowledged that, if the conversation had taken place in the holding facility at the Montgomery County Detectives building, [Tuggle] would have been handcuffed and "secured" at the time of the conversation.

Asked by [defense counsel] if his conversation with [Tuggle] had "included your concern" over a handgun that was discovered during the search of [Tuggle's] apartment, Detective Vinter testified that he could not recall having any discussion with [Tuggle] concerning the handgun. The detective testified:

> I don't know if I ever said anything about a handgun, Your Honor. I know I didn't ask him anything about what was found in his residence, other than asking him if he would supply a statement and cooperate. He said he would. But what was found in the house I never asked him.

As the [trial court] stated on the record in denying [Tuggle's] motion to suppress, [the] court fully credited Detective Vinter's testimony in its entirety.

Detective [Michael] Reynolds testified that he took [Tuggle's] statement in an interview room in the Montgomery County Detectives building. The detective testified that, prior to taking the statement, he read [Tuggle] his rights under **Miranda v. Arizona**, and [Tuggle] then executed a written waiver of those rights. The waiver on its face explicitly advised [Tuggle] that: he had the right to remain silent and that anything he said could and would be used against him; that he had a right to consult a lawyer before being questioned and to have a lawyer present during questioning; that if he could not afford a lawyer, a lawyer would be provided to him without cost prior to questioning; and that he had the right to refuse to answer any questions and to stop talking at any time.

After [Tuggle] executed the waiver, Detective Reynolds conducted an interview of [Tuggle], beginning at 11:00 a.m. and

_____

[2]    384 U.S. 436 (1966).

ending at 11:50 a.m. The detective testified that [Tuggle] was cooperative, and that at no point did the conversation become contentious or heated, and at no point did [Tuggle] ask to stop the interview or ask for a lawyer.

Detective Reynolds then typed [Tuggle's] statement and gave it to him to review and make any changes he wanted. A copy of the typed statement was entered into evidence at [Tuggle's] suppression hearing. The statement on its face contains [Tuggle's] explicit acknowledgment that no threats or promises had been made to him to induce him to talk to Detective Reynolds, and [Tuggle's] explicit acknowledgment that his decision to provide a statement . . . was a product of his own free will.

As the [trial court] stated on the record, [the] court fully credited the testimony of Detective Reynolds in its entirety.

[Tuggle] testified on his own behalf at the suppression hearing. [Tuggle's] testimony did not contradict, in any material way, the testimony of Detective Reynolds. [Tuggle's] testimony was, however, at odds with that of Detective Vinter in regard to the conversation between the two men during which [Tuggle] agreed to provide a statement to the police.

In contrast to Detective Vinter, [Tuggle] testified:

> That conversation was mainly about the firearm that was recovered in the apartment, more or less. Questioning me about was anything on it, which would refer to like it being a dirty gun or I guess a body or so being on it.

[Tuggle] further testified:

> I was telling him that I'm not sure if anything's on it. I was telling him it's not my firearm. But I was just mostly like a little timid because he was like more persistent with trying to like more or less put it on me or so, or what I would say would be to try to scare me.

[Tuggle] stated:

> I felt intimidated because I wasn't sure. I had no idea if anything would come up on the firearm. So I was intimidated. I was kind of scared.

[Tuggle] testified that he was concerned that the handgun— which he denied owning—might have been used in a crime that the police would try to "pin it on me" because the gun was discovered during a search of his residence. [Tuggle] testified that this concern "played a major role" in his decision to waive his **Miranda** rights and give a statement, testifying that he thought that "if I give him a statement then maybe he would stop asking me about the firearm or so."

On cross-examination by the attorney for the Commonwealth, [Tuggle] testified that no threats or promises were made to him to induce him to make a statement, but he asserted that he nonetheless felt "intimidated." Asked to explain exactly what Detective Vinter said that made him feel intimidated, [Tuggle] testified:

> He said that I better hope nothing came back on the firearm. He intimidated me by saying that a lot of things that's going on in Norristown as far as the unresolved murders or pertaining to crimes, things of that nature, that if something's on that firearm then it will reflect on me. That's what was intimidating to me.

Asked directly if Detective Vinter had told him that giving a statement would help him, [Tuggle] replied: "No."

Trial Court Opinion ("T.C.O."), 3/11/2014, at 2-6 (citations to notes of testimony omitted; some punctuation modified).

In the statement that Tuggle provided to Detective Reynolds, Tuggle admitted to stealing blank prescription forms, to filling out these prescription forms and forging doctors' signatures, to growing marijuana plants, and to selling marijuana and Percocet. Tuggle denied ownership of the handgun, however, and stated that it belonged to a woman that left it in his apartment.

In his motion, Tuggle sought to suppress the statement that he provided during the interview with Detective Reynolds. The trial court

denied Tuggle's suppression motion because the court credited the Detectives' testimony over that provided by Tuggle and determined that Tuggle's statement had been preceded by a knowing, voluntary, and intelligent waiver of his *Miranda* rights. T.C.O. at 8, 9. On July 16, 2013, Tuggle proceeded to a nonjury trial, and he was convicted on the following day. On December 16, 2013, the trial court conducted a sentencing hearing, after which it imposed an aggregate sentence of not less than seven and one half years nor more than fifteen years' incarceration, to be followed by a two year period of probation.

Tuggle filed a timely notice of appeal on January 15, 2014. On January 21, 2014, the trial court directed Tuggle to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), to be served upon the court no later than February 11, 2014. Tuggle filed a timely concise statement on February 7, 2014. On March 11, 2014, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a).

Tuggle raises the following issue for our review:

Whether the trial court erred in denying [Tuggle's] Motion to Suppress his statements in that such statements were not preceded by a knowing, intelligent, and voluntary waiver of *Miranda* rights as the alleged waiver was preceded by coercive questioning by Detective James Vinter of [Tuggle] relating to the gun found in the premises and wanting him to cooperate with law enforcement authorities, which tainted the voluntariness of the subsequent *Miranda* waiver?

Brief for Tuggle at 4.

When reviewing a trial court's order denying a suppression motion, our standard of review is well-settled:

> In reviewing a suppression ruling, we are bound by the suppression court's factual findings, unless they are without support in the record. We may reverse the legal conclusions reached by the suppression court, however, if they are in error. Thus, our standard of review of the legal conclusions reached by the suppression court is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we consider only the evidence of the prosecution, and so much of the evidence for the defense which remains uncontradicted when fairly read in the context of the [suppression] record.

*Commonwealth v. Galvin*, 985 A.2d 783, 795 (Pa. 2009) (citations omitted). Additionally, "[i]t is within the suppression court's sole province as fact finder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Clemens*, 66 A.3d 373, 378 (Pa. Super. 2013) (citation omitted). With regard to our scope of review in the context of an order denying a suppression motion, we are limited to reviewing only the evidence that was presented at the suppression hearing, and may not consider testimony adduced at trial. *See In re L.J.*, 79 A.3d 1073, 1083–87 (Pa. 2013).

Tuggle argues that, although he executed a waiver of his *Miranda* rights prior to the interview with Detective Reynolds, his waiver was not knowing, voluntary, and intelligent because it was influenced by Detective Vinter's allegedly coercive questioning. Specifically, Tuggle asserts that Detective Vinter questioned him about the firearm that was discovered in his apartment, and that the detective intimidated him by implying that Tuggle

may be implicated in any crimes in which the firearm was previously used. Brief for Tuggle at 22. Detective Vinter contradicted Tuggle's testimony, asserting that he only asked Tuggle if he was willing to cooperate and provide a statement, and that he did not question Tuggle about anything that was found in the apartment. On review of a ruling denying suppression, we consider only the evidence of the prosecution, and so much of the evidence for the defense which remains uncontradicted when fairly read in the context of the entire record. *Galvin*, 985 A.2d at 795. As Tuggle's testimony was contradicted at the suppression hearing, we may not consider it on appellate review.

The trial court fully credited Detective Vinter's testimony, and found Tuggle's testimony to be incredible and unpersuasive. T.C.O. at 8. "As we believe that credibility at a suppression hearing is an important determination best resolved through the court's personal observations, we will not reverse a suppression court's assessment of credibility absent clear and manifest error." *Commonwealth v. Camacho*, 625 A.2d 1242, 1245 (Pa. Super. 1993). The record provides us no reason to believe that the trial court committed a clear and manifest error in making its credibility determinations. Thus, even if we are to consider Tuggle's testimony concerning his interaction with Detective Vinter, we are bound by the trial court's credibility determinations.

While our standard of review is highly deferential with respect to the suppression court's factual findings and credibility determinations, we afford

no deference to the suppression court's legal conclusions, and review such conclusions *de novo*. *In re L.J.*, 79 A.3d at 1080 n.6. With regard to the validity of a waiver of *Miranda* rights, our Supreme Court has described the law of our Commonwealth as follows:

> In determining whether a defendant's waiver of his *Miranda* rights is valid, a trial court must consider: (1) whether the waiver was voluntary, in the sense that the waiver was not the result of governmental pressure; and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice. The Commonwealth bears the burden of establishing that a defendant knowingly and voluntarily waived his *Miranda* rights. Factors to be considered in determining whether a waiver is valid and a confession is voluntary include: the duration and means of interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any other facts which may serve to drain one's powers of resistance to suggestion and coercion.

*Commonwealth v. Patterson*, 91 A.3d 55, 76 (Pa. 2014) (citations omitted).

Tuggle was apprised fully of his *Miranda* rights before his interview with Detective Reynolds, and he signed a waiver form, which indicated that he was aware of his rights and was willing to give a voluntary statement. Tuggle does not allege that Detective Reynolds coerced him, but rather that his prior interaction with Detective Vinter "intimidated" him. Notes of Testimony, Suppression Hearing, ("N.T."), 7/15/2013, at 66. As to the duration of this alleged interaction with Detective Vinter, Tuggle testified that it was approximately five minutes. *Id.* at 65. Tuggle testified that he

was interviewed in a room that the detectives called a "holding room." ***Id.*** at 59. While the record does not provide a detailed description of the "holding room," Tuggle did not testify that the room itself was particularly intimidating or oppressive.

Tuggle noted that he had been consuming marijuana from approximately 2:30 a.m. until 5:00 a.m. on the morning of his arrest. N.T. at 67. The interview with Detective Reynolds during which Tuggle executed the waiver of his ***Miranda*** rights began at 11:00 a.m., approximately six hours after he had stopped smoking marijuana. While the fact that Tuggle had consumed marijuana prior to executing the waiver is relevant to Tuggle's physical and psychological state, Tuggle testified that, at the time that he gave the statement to Detective Reynolds, he was not impaired to a degree that would prevent him from giving a statement. ***Id.*** at 69.

The most pertinent factor to be considered in determining whether Tuggle's waiver is valid is the attitude exhibited by the police during the interrogation, because Tuggle's argument is premised upon the alleged intimidation that he felt after interacting with Detective Vinter. However, as we discussed above, Tuggle's testimony about the interaction was contradicted by Detective Vinter's testimony. Furthermore, the trial court appropriately exercised its discretion in crediting Detective Vinter's testimony over Tuggle's—a determination that we will not disturb on appeal.

The trial court summarized the basis for its legal conclusions as follows:

> Stated directly, this court heard no evidence indicating that any improper coercive or intimidating tactics were employed to induce the defendant to waive his **Miranda** rights and provide his statement to Detective Reynolds. The evidence this court heard rather supports the determination that the defendant's waiver of **Miranda** rights and his statement to the detective were voluntary, and a product of the defendant's own free will.

N.T. at 101. We have analyzed the relevant factors, and have determined that Tuggle's waiver of his **Miranda** rights was voluntary, knowing, and intelligent. As such, his waiver was valid, and the trial court's conclusions of law were not erroneous.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/21/2014

- 11 -