J-S01029-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL E. MCNEIL | |
| Appellant | No. 2397 EDA 2014 |

Appeal from the Judgment of Sentence March 25, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0006167-2012

BEFORE:  GANTMAN, P.J., MUNDY, J., and MUSMANNO, J.

MEMORANDUM BY MUNDY, J.:                    **FILED MARCH 30, 2016**

Appellant, Michael E. McNeil, appeals from the March 25, 2014 aggregate judgment of sentence of 8 to 24 years' imprisonment, following his convictions by a jury of voluntary manslaughter, carrying firearms on public property in Philadelphia, and possession of an instrument of a crime (PIC).[1]  Based upon our *sua sponte* review of the legality of Appellant's sentence, we are constrained to vacate and remand for resentencing.

---

[1] 18 Pa.C.S.A. §§ 2504(a), 6108, and 907(a), respectively.  The record reveals Appellant was actually tried and convicted of carrying a firearm without a license, not carrying firearms on public property in Philadelphia. **See generally** 18 Pa.C.S.A. § 6106.  It appears from the record the trial court mistakenly sentenced Appellant on the basis of a conviction for carrying firearms on public property in Philadelphia.  N.T., 3/25/14, at 35-36.  At the time of sentencing neither party objected to this mistake.  **Id.** As we are vacating and remanding Appellant's sentence based on the
*(Footnote Continued Next Page)*

The trial court set forth the relevant factual history of this case as follows.

On May 5, 2012, at approximately 3:00 p.m., [Appellant] was standing on his porch at 5639 Nelson Street talking with [Keenan] Gaskins, Aaron Tucker ("Tucker"), Kenneth McTillman ("McTillman"), and several others. A group of males walked up to the porch and began arguing with them. A few minutes later, two of the people present started fighting, which escalated into a melee involving everyone who had been on the porch and in the group who walked up.

Approximately five minutes after the fight began, Jahleel Johnson ("Johnson") fired a single shot into the air from a 0.38 revolver. After Johnson fired into the air, [Appellant] began wildly firing a 0.380 automatic pistol in his direction. [Appellant] fired three times until the gun jammed and couldn't fire anymore. Upon hearing the gunshots, everyone involved in the fight scattered and ran away. Nyeem Lewis ("Lewis") ran towards Johnson firing a gun as Johnson fled down the street. When the scene cleared, Gaskins remained on the ground after having been struck by one of [Appellant]'s bullets. The Medical Examiner, Dr. Osbourne, testified that the bullet had entered Gaskins' back, gone through his spinal cord, aorta, and lung, and exited his chest.

When Officer Czepiel arrived at the scene, he found Gaskins face down on the pavement, lying in a pool of blood. After hearing that the ambulance was not going to arrive soon, Officer Czepiel directed Tucker and McTillman to place Gaskins in the back of his marked police car. Tucker remained in the car with Gaskins, and Officer Czepiel drove them to the

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

application of an illegal mandatory minimum sentence, we need not reach this issue, but note that the trial court should correct the discrepancy at resentencing.

hospital. Gaskins was pronounced dead at Albert Einstein Medical Center at 3:31 p.m.

Trial Court Opinion, 4/16/15, at 2-3.

Thereafter, on May 7, 2012, Appellant was arrested and charged in connection with Gaskins' death. On May 30, 2012, the Commonwealth filed its notice of its intent to seek mandatory minimum sentences pursuant to Section 9712 for offenses committed with firearms, and Section 9714 for second and subsequent offenses. The case proceeded to trial and on December 10, 2013, the jury found Appellant guilty of the aforementioned charges. On March 25, 2014, the trial court imposed an aggregate sentence of 8 to 24 years' imprisonment.[2] On April 1, 2014, Appellant filed a timely post-sentence motion which was denied by the trial court on July 31, 2014. On August 13, 2014, Appellant filed a timely notice of appeal.[3]

On appeal, Appellant raises the following issues for our review.

> A. Whether Appellant is entitled to an arrest of judgment as to the charge of voluntary manslaughter, because the Commonwealth failed to prove each element of the crime charged beyond a reasonable doubt?

_____

[2] Specifically, Appellant was sentenced to 6 to 20 years on the charge of voluntary manslaughter, and a consecutive sentence of 2 to 4 years on the VUFA charge. N.T., 3/25/14, at 36. No further penalty was imposed on the PIC charge. *Id.* As noted, a five-year mandatory minimum was applied to the voluntary manslaughter charge. *Id.* at 35.

[3] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

    B. Whether Appellant is entitled to an arrest of judgment as to the charge of Violation of the Uniformed [sic] Firearms Act, because the Commonwealth failed to prove each element of the crime charged beyond a reasonable doubt?

Appellant's Brief at 6.

   Our review is guided by the following. "In reviewing the sufficiency of the evidence, we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the [finder of fact] verdict beyond a reasonable doubt." **Commonwealth v. Patterson**, 91 A.3d 55, 66 (Pa. 2014) (citation omitted), *cert. denied*, **Patterson v. Pennsylvania**, 135 S. Ct. 1400 (2015). "The Commonwealth can meet its burden by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." **Commonwealth v. Watley**, 81 A.3d 108, 113 (Pa. Super. 2013) (*en banc*) (internal quotation marks and citation omitted), *appeal denied*, 95 A.3d 277 (Pa. 2014). As an appellate court, we must review "the entire record … and all evidence actually received[.]" **Id.** (internal quotation marks and citation omitted). "Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Diamond**, 83 A.3d 119,

126 (Pa. 2013) (citation omitted), *cert. denied,* **Diamond v. Pennsylvania**, 135 S. Ct. 145 (2014).

In this case, Appellant first challenges the sufficiency of his conviction for voluntary manslaughter which is codified as follows.

### § 2503. Voluntary manslaughter

**(a) General rule.**--A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

18 Pa.C.S.A. § 2503(a).

Appellant asserts the Commonwealth failed to present sufficient evidence that the killing was in the heat of passion. Appellant's Brief at 11. Appellant's four-page argument recounts his view of the trial testimony and concludes that "not one witness testified live that Appellant was involved in the shooting." **Id.** at 14. Rather, Appellant claims the "Commonwealth's case is premised upon the written statements of witnesses who testified under oath that the statements are untrue and the product of coercive interrogation tactics." **Id.** at 14. The Commonwealth counters,"[t]o the extent that [Appellant] disregards his own statement and the statements of his eyewitness cohorts as incredible, that assertion is unavailing on

sufficiency review, where the credibility of the evidence is not at issue and where all of the evidence is considered in the light most favorable to the Commonwealth." Commonwealth's Brief at 8.

After careful review, we agree with the Commonwealth that the credibility of the witnesses is not at issue when reviewing the sufficiency of the Commonwealth's evidence. *See Commonwealth v. Melvin*, 103 A.3d 1, 43 (Pa. Super. 2014) (stating, "[a]n argument regarding the credibility of a witness's testimony "goes to the weight of the evidence, not the sufficiency of the evidence[]"). Rather, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we conclude the record reveals sufficient evidence to convict Appellant of voluntary manslaughter.

In its Rule 1925(a) opinion, the trial court noted the following.

> At trial, the jury heard testimony from numerous civilian witnesses, members of the Philadelphia Police Department, and the Medical Examiner, Dr. Osbourne. Johnson testified that he was standing on the corner of Nelson and Woodlawn streets, and that he fired a 0.38 revolver once in the air after the fight broke out down the street. Tucker testified that he had been standing on the porch at 5639 Nelson Street with [Appellant], his cousin. After the group of males walked up to the house, Tucker testified that he and the others began to fight with them until gunshots rang out and everyone ran away. Tucker further testified that he told [Appellant] to give the police made-up names and tell them that those made-up individuals were the people carrying guns at the scene. Marquise Graham-Budd, a friend of [Appellant]'s who was present at the fight, testified that three guns, a

revolver, a 0.380, and a Tek-9, were kept in a bookbag on the porch at [Appellant]'s house.

The jury also heard testimony from numerous members of the Philadelphia Police Department. Detective Tolliver testified that he took [Appellant]'s statement while he was at the police station after the incident. He read [Appellant]'s own sworn statement that [Appellant] had fired "wildly" towards Johnson after hearing the first gunshot. In his statement, [Appellant] also said that he had fired until his gun jammed, and couldn't fire anymore. Detective Aitken testified that he took McTillman's statement after the incident with Detective Scally. In his sworn statement, McTillman said that he saw [Appellant] "running down the street shooting," but didn't see the gun after the police arrived on the scene.

Trial Court Opinion, 4/16/15, at 5-6.

The trial court's findings are supported by the record. At trial, the Commonwealth called Aaron Tucker as a witness. Tucker testified that on May 5, 2012, he was present when the fight between several people broke out on the porch at his Aunt's house. N.T., 12/3/13, at 123-124. Tucker stated that five or six guys approached the porch where he was standing with Appellant, the victim, and several other people. *Id.* at 125. Tucker testified a fight broke out, he heard one shot, then seconds later approximately eight shots, and everyone ran. *Id.* at 132-133. Tucker further testified that Appellant was standing on the steps and was not involved in the fight. *Id.* at 133.

On direct examination, the Commonwealth presented Tucker's second statement to police given days after the incident. *Id.* at 152. The

Commonwealth read Tucker the questions and his answers from the statement, asking Tucker to verify the information.

> Q. "QUESTION: Were you completely honest [on May 5, 2012] when you were first interviewed by the detectives?" Do you recall being asked that question?
>
> A. Yes.
>
> Q. "ANSWER: No. I was scared and I didn't want to tell them everything. [The victim] is like a brother to me. [Appellant] is my cousin, my first cousin." Did you say that?
>
> A. Yes.
>
> Q. Is that true?
>
> A. Yes.
>
> Q. "QUESTION: What did you leave out the first time?" Do you recall being asked that question?
>
> A. Yes.
>
> Q. "ANSWER: I was involved in a fight at the time. I was fighting a boy named Hak. He was there with some of his people. There was Jahleel and Gee. During the fight, Jahleel pulled a gun out and fired it in the air. The fight started to break up. That's when [Appellant] pulled out a gun and he started to chase Jahleel. Twig was also chasing Jahleel, also. Twig was running with [Appellant]. He was kind of on the side of him. I was coming off a lady's porch when they were first running on Nelson Street towards Woodlawn Street. I got off the porch and that's when I saw Twig laying on the ground. I ran over to him and tried to help him. [Appellant] was there also. Ken and Amir were there, also. There was a lady there who was my neighbor's nurse for her kids. She was trying to get a pulse. The cops came and we put Twig in the car. I went with Twig

to the hospital. I stayed with him until they pronounced him dead. The police took me there. I didn't know what to do so I lied. I told [Appellant] to give all those fake names, Piece, Don, Rell and Kev. They were just made up." Do you recall giving that answer to that question to the detectives?

A. No, I don't.

Q. Well, what don't you recall? Did you say that?

A. I don't recall ever saying that [Appellant] pulled out a gun or that I seen him running on the side with Twig.

Q. But they got everything else right?

A. No.

Q. What else is wrong with that paragraph?

A. When he – when they said that I was coming off the porch, that was right. But when they said that, when they said that I seen Jahleel pulling out a gun, I didn't see Jahleel pull out a gun. And I was on the porch. So how could I see him pull out a gun?

Q. Anything else wrong with that paragraph that you didn't say?

A. That's it.

Q. So basically the detectives got everything correct except the fact of [Appellant] having a gun and chasing down the street with Twig and Jahleel having a gun.

A. Right.

…

Q. "QUESTION: What kind of gun did [Appellant] have?" Do you recall that question?

A. No.

Q. "ANSWER: It was a handgun. I think it was black." Did you say that?

A. No.

…

Q. "QUESTION: When [Appellant] was running toward Woodlawn, who was he shooting at?" Do you recall being asked that question?

A. No.

Q. "ANSWER: Jahleel." Do you recall saying that?

A. Huh? Jahleel?

Q. Yes.

A. No.

Q. You didn't say that?

A. No.

Q. "QUESTION: How many shots did [Appellant] fire?" Do you recall being asked that question?

A. No.

Q. "ANSWER: About four." Do you recall saying that?

A. No.

…

Q. "QUESTION: Detective Grebloski is showing you a photo. Is this the [Appellant] you have referred to in your interview?" Do you recall being asked that and being shown a photograph of [Appellant]?

A. No. He asked me if this is my cousin. That's what he asked me.

Q. Okay. But did I read that correctly what's down there?

A. Yes, you did.

Q. Was your answer, "Yes. That's [Appellant]." Did you say that?

A. Yes.

*Id.* at 152-164.

Most of the remaining questions Tucker was asked to verify from his statement did not pertain to Appellant. *See id.* Tucker answered that he recalled answering those questions as stated. *See id.* The jury was free to weigh Tucker's testimony against his written statement. *See Hansley*, *supra*.

The Commonwealth also presented Kenneth McTillman as a witness, who, like Tucker, testified that he was involved in the altercation on May 5, 2012, but that he did not see anyone with a gun or see who fired the gunshots. N.T., 12/3/13, at 205-209. McTillman was also presented with his statement to police, which read "I looked toward the street and saw Amir and [Appellant] running down the street shooting." *Id.* at 217. The statement included the following.

Q. "QUESTION: Did you see [Appellant] with the gun after the shooting?" Do you recall that question?

A. No.

- 11 -

Q. "ANSWER: I seen him during the shooting but not afterward. He was around us when the cops came. I didn't see what he did with the gun." Do you recall giving that answer to that question?

A. No.

Q. "QUESTION: Do you know what kind of gun it was?" Do you recall being asked that question?

A. Yes.

Q. "ANSWER: It was some type of automatic." Did you say that?

A. No. I told him it was a revolver.

*Id.* at 219-220. Similar to Tucker, McTillman testified that he did not recall giving many of the answers in his sworn statement, or that the answers were inaccurate. Further, McTillman disputed signing or reviewing the statement. At trial, Detective Ronald Aitken testified to taking McTillman's statement on May 6, 2012, as well as the accuracy of the statement. N.T., 12/4/13, at 28.

Detective Edward Tolliver also testified for the Commonwealth. Detective Tolliver took Appellant's statement following the incident, which in relevant part, encompassed the following.

"QUESTION: Tell us what happened."

"ANSWER: There was a fight on the block. People started shooting and the next thing I know, Keenan laying on the street dead. While the fight was going on, I hear a shot. I got scared and pulled my gun out and then I started shooting."

- 12 -

…

> "When you saw that male fire his gun into the air, what did you do"
>
> "ANSWER: I pulled my gun from my waistband and started shooting."
>
> "QUESTION: How many times did you fire the gun you had?"
>
> "ANSWER: Three times. It jammed and I couldn't shoot no more."
>
> "QUESTION: What kind of gun did you have?"
>
> "ANSWER: It was a .380 automatic. It's black.
>
> "QUESTION: Who were you shooting at when you fired your gun?
>
> "ANSWER: I was wildly shooting at the corner in the direction of the man I saw shoot his gun."

*Id.* at 86-88. The statement was signed by Appellant and dated May 6, 2012. *Id.* at 95.

Several other witnesses gave similar statements to police, although each eye-witness recanted his statement at trial. Despite each of the witnesses testifying at trial to a different recollection of the events than those they gave in their sworn statements to police, the jury, as fact-finder, was free to weigh all of the evidence and testimony. *Watley*, *supra*; *see also Commonwealth v. Brown*, 52 A.3d 1139, 1171 (Pa. 2012) (holding "the out-of-court statements of [Appellant and his co-defendants which were recanted at trial] furnished legally sufficient evidence to sustain Appellant's

convictions[]"). Further, the evidence presented was sufficient for the jury to find Appellant acted in the heat of passion in response to Johnson's first shot. Accordingly, Appellant's first issue fails.

In his second issue, Appellant argues the evidence was insufficient to convict him of carrying a firearm without a license. This crime is defined as follows.

> **§ 6106. Firearms not to be carried without a license**
>
> **(a) Offense defined --**
>
> (1) Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.
>
> …

18 Pa.C.S.A. § 6106(a)(1).

Instantly, Appellant's argument is approximately one-page long and vacillates between arguing elements of carrying a firearm on public streets in Philadelphia and carrying a firearm without a license. Appellant's Brief at 14-15. As noted above, there was confusion at sentencing resulting in Appellant being sentenced for the wrong VUFA offense. Nevertheless, despite the confusion, the record reveals that sufficient evidence was produced at trial for the jury to conclude Appellant carried a firearm without a license. "The Commonwealth presented a certificate of nonlicensure,

evidence marked Commonwealth's Exhibit C-44. The certificate showed that on May 5, 2012, [Appellant] did not have a valid license to carry a firearm." Trial Court Opinion, 4/16/15, at 6; N.T., 12/4/13, at 21-23. Additionally, as noted in the previous issue, evidence was presented through eye-witness statements to police that Appellant was in possession of a gun. N.T., 12/3/13, at 156, 219. Therefore, Appellant's second issue also fails.

Notwithstanding our disposition of Appellant's issues on appeal, we are constrained to address a legality of sentencing issue *sua sponte*. "[A] challenge to the legality of the sentence can never be waived and may be raised by this Court *sua sponte*." **Commonwealth v. Wolfe**, 106 A.3d 800, 801 (Pa. Super. 2014), *appeal granted* 121 A.3d 433 (Pa. 2015). As noted, Appellant was sentenced to a mandatory minimum pursuant to Pa.C.S.A. § 9712. In **Commonwealth v. Newman**, 99 A.3d 86 (Pa. Super. 2014) (*en banc*), this Court held that Section 9712.1 was facially unconstitutional. **Id.** at 102. In **Commonwealth v. Valentine**, 101 A.3d 801 (Pa. Super. 2014), this Court, applying **Newman**'s rationale, concluded that Section 9712 is also facially unconstitutional. **Id.** at 811-812. Thus, Appellant's sentence is illegal.

Based on the foregoing, we conclude the evidence was sufficient to convict Appellant; however the trial court imposed an illegal sentence. Accordingly, we vacate the trial court's March 25, 2014 judgment of

sentence, and remand for resentencing without consideration of the mandatory minimum, in accordance with this memorandum.

Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/30/2016