J-S60027-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DAMION RIVERS | |
| Appellant | No. 1415 EDA 2015 |

Appeal from the Judgment of Sentence December 5, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001598-2013

BEFORE: SHOGAN, J., OTT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY OTT, J.: **FILED OCTOBER 19, 2016**

Damion Rivers appeals from the judgment of sentence entered December 5, 2014, in the Philadelphia County Court of Common Pleas. The trial court imposed a sentence of life imprisonment following Rivers's jury conviction of first-degree murder, criminal conspiracy, and firearms not to be carried without a license[1] for the shooting death of Joel "Knight" Henderson. On appeal, Rivers challenges two evidentiary rulings, as well as the weight and sufficiency of the evidence supporting his convictions. For the reasons below, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502, 903, and 6106, respectively.

The facts underlying Rivers's convictions are summarized by the trial court as follows:

[Rivers] shared living accommodations with his co-worker, Michael Emanuel ("Emanuel"), sometimes at the home of [Rivers's] parents and sometimes at the home of [Rivers's] girlfriend Amber Cronon ("Cronon"). [Rivers] did not have a valid driver's license and would often ask Emanuel, who did have a valid driver's license, to drive him around on various errands in Cronon's white Nissan sedan. On the evening of [August 30, 2011, Rivers] met Em[]anuel at [Rivers's] parents house and told Emanuel to get dressed because they were going to go for a ride. Em[]anuel followed [Rivers] out of the house where a male known as "Ale" was waiting for them. That day, [Rivers] and Ale exchanged 19 calls prior to meeting Emanuel. At 8:55 P.M., [Rivers] borrowed Ale's cell phone, dialed [Joel] Henderson's number and told Emanuel to arrange a purchase of five (5) "dipper sticks"[4]. Emanuel complied. Emanuel had arranged to purchase one or two (1-2) dippers from Henderson, also known as "Knight", on several prior occasions. Five (5) dippers would have cost in excess of $50, and Emanuel did not know how they would pay for the drugs, as "money was tight".

_____

[4] Also known as "dippers", a cigarette [] that is dipped in embalming fluid and smoked, producing hallucinogenic properties.

_____

Although Cronon's car was parked outside, the three (3) men got into a green Nissan Altima that was in [Rivers's] father's possession. This was the first time Emanuel and [Rivers] used the Nissan Altima, and the first time Ale had accompanied [Rivers] and Emanuel to pick up dippers. [Rivers], Emanuel, and Ale went to meet [Henderson] at Comley and Miln[o]r Streets to purchase the dippers. During the ride to the meeting place, [Rivers] and Ale spoke with each other in a

language which Emanuel did not understand.[2] [Rivers] directed Emanuel to park in a different place than they normally parked when picking up the dippers. Instead of parking in the area where other cars were parked, close to houses, [Rivers] instructed Emanuel to park farther away from the houses under a telephone pole.

When the three (3) males arrived at the agreed upon location, Henderson was not there. At 9:04 P.M., another call was made from Ale's cell phone to Henderson who was with his cousin Tasha Cooper ("Cooper") at a house on nearby Homestead Street. Henderson left Cooper and walked toward Miln[o]r Street. [Rivers] asked Emanuel to give him the keys to the Nissan, and [Rivers] put them in his pocket. Emanuel observed that Ale and [Rivers] were each armed with a handgun. By the time Henderson appeared, [Rivers] had exited the vehicle and Emanuel and Ale remained in the car. While [Rivers] and Henderson were talking and Henderson had started dipping the cigarettes, Ale exited the car and walked up behind [Henderson] with his weapon drawn. Henderson turned and threw the dipper liquid at Ale, who started shooting and struck [Henderson] multiple times. [Rivers], and Ale returned to the green Nissan and [Rivers] instructed Emanuel to drive the men out of the area. Cooper, who was still nearby and knew Henderson sold drugs, heard gunshots and ran towards the location of the shooting. Cooper found [Henderson] lying injured in the street. After Emanuel and [Rivers] dropped Ale off, [Rivers] told Emanuel that [Henderson] got what he deserved. Emanuel linked this statement to an incident which had occurred two (2) weeks earlier wherein [Rivers] had contact with the police while trying to purchase dippers from Henderson.

Henderson was pronounced dead at 10:04 P.M. on August 30, 2011. An autopsy was performed by Deputy Chief Medical Examiner Dr. Gary Collins. [Henderson] was shot three (3) times; twice in the back of the torso which caused extensive internal bleeding, and once in the right forearm. The bullets that struck the decedent in the back exited the front of his chest,

_____

[2] Emanuel testified they were speaking in a "broken slang version" of "Jamaican." N.T., 11/10/2014, at 104.

while the bullet that struck [Henderson's] forearm remained lodged there. The cause of death was found to be multiple gunshot wounds and the manner of death was found to be homicide. The ballistics specimen recovered from [Henderson's] forearm was consistent with having been fired from a nine (9) millimeter handgun. Four (4) fired cartridge casings (FCC's) were recovered from the scene and it was determined that all four (4) FCC's had been fired from the same nine millimeter, semi-automatic weapon. A Firearms Purchase Record revealed that Cronon purchased a nine (9) millimeter semiautomatic handgun on August 12, 2011.

On September 7, 2011, Police Officer Edward Braceland ("Officer Braceland") received a radio call which took him to the Thomas Jefferson University Hospital Emergency Room. Upon arrival, he spoke with Emanuel who appeared to be in a very agitated state of mind but who told Officer Braceland that he had information on a [m]urder and was afraid for his life. A 302 Commit form [for mental health] was completed because of Emanuel's stated threat to kill himself, and Emanuel was taken to the crisis center. After Emanuel was released from the mental health crisis center, he went to the Homicide Division and made a statement to homicide detectives on September 12, 2011. He also gave detectives the number to the cell phone that he and [Rivers] shared. Emanuel gave written statements to the homicide detectives on three (3) different occasions and took the police to the location where the green Nissan was parked.

At trial, Emanuel testified that he had an open criminal matter in Philadelphia and that he was on [p]robation in another matter. He also had juvenile adjudications for Making False Reports and for Robbery. Emanuel stated that no promises had been made to him by the Commonwealth in connection with his testimony in this case, however it was stipulated that Emanuel had received an Order [o]f Immunity regarding his testimony in the case at bar. The cell phone records of Henderson and [Rivers] were requested and later presented at trial.

Trial Court Opinion, 10/13/2015, at 4-7 (record citations and some capitalizaion omitted).

Rivers was subsequently arrested and charged with murder, criminal conspiracy, persons not to possess firearms, carrying a firearm without a

license, carrying a firearms on a public street in Philadelphia, and possessing an instrument of crime.[3] The case proceeded to a jury trial, and on November 17, 2014, the jury found Rivers guilty of first-degree murder, conspiracy, and carrying a firearm without a license, and not guilty of possessing an instrument of crime. Rivers was sentenced, on December 5, 2014, to a term of life imprisonment for first-degree murder. No further punishment was imposed on the remaining charges. Rivers filed a post-sentence motion challenging the weight and sufficiency of the evidence, which was denied by operation of law on April 9, 2015. This timely appeal followed.[4]

In his first two issues,[5] Rivers challenges the trial court's evidentiary rulings. Our standard of review is well-settled: "The admissibility of

---

[3] 18 Pa.C.S. §§ 2502, 903, 6105, 6106, 6108, and 907, respectively. The charges of persons not to possess firearms and carrying firearms on a public street in Philadelphia were *noll prossed* before trial.

[4] On May 12, 2015, the trial court ordered Rivers to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Rivers complied with the court's directive, and filed a concise statement on June 10, 2015.

The delay thereafter resulted from both parties seeking additional time to file their briefs before this Court. *See* Order, 11/25/2015 (granting Rivers's application for extension of time); Order, 1/22/2016 (granting Rivers's second application for extension of time); Order, 3/16/2016 (granting Commonwealth's application for extension of time); Order, 5/12/2016 (granting Commonwealth's second application for extension of time).

[5] We have reordered Rivers's claims for purposes of disposition.

evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion." ***Commonwealth v. Poplawski***, 130 A.3d 697, 716 (Pa. 2015) (citation omitted).

Rivers first argues the trial court erred in permitting Emanuel to "speculate" as to what he thought Rivers meant when he said "'Knight got what he deserved.'" Rivers's Brief at 27, *citing* N.T., 11/10/2014, at 139. Emanuel testified he believed Rivers was referring to an incident that occurred several weeks prior, when Rivers was stopped by police on his way to purchase dippers from Henderson. ***See id.*** However, because Rivers did not specifically explain to Emanuel the reason why he made the statement, Rivers contends "Emanuel was purely speculating that [Rivers] was referring to the earlier incident" and "[i]t is well settled that firsthand or personal knowledge is a universal requirement of the law of evidence." ***Id.***, *citing* ***Johnson v. Peoples Cab Co.***, 126 A.2d 720 (Pa. 1956). Accordingly, Rivers asserts the trial court erred in allowing Emanuel to speculate as to what was in Rivers's mind without any first-hand knowledge. ***See id.*** Further, Rivers claims the admission of the testimony was "devastating … because it served as what the Commonwealth argued was motive evidence." ***Id.*** at 28.

The trial court, however, found that Rivers failed to preserve this issue for appeal. ***See*** Trial Court Opinion, 10/13/2015, at 15. We agree. It is axiomatic that a defendant must make a **timely and specific** objection to a

- 6 -

trial court's ruling in order to preserve the claim for appeal. *See* Pa.R.E. 103(a)(1) ("A party may claim error in a ruling to admit … evidence only … if … a party, on the record (A) makes a timely objection, motion to strike, or motion *in limine*; and (B) states the specific ground, unless it was apparent from the context[.]"). Although Rivers objected twice to Emanuel's testimony regarding the prior incident, he did not "specifically state what the objection was[.]" Trial Court Opinion, 10/13/2015, at 15. *See* N.T., 11/10/2014, at 139, 142. Accordingly, Rivers's claim is waived on appeal.

Nevertheless, even if we were to find the issue preserved, we would conclude Rivers is entitled to no relief. Emanuel was with Rivers the night he was stopped by police. *See* N.T., 11/10/2014, at 139. He described the incident, which occurred about two weeks before the shooting, as follows:

> I remember an incident happened where me, [Rivers] and Amber and they had his daughter and Amber's daughter in the car. We went to buy dipper sticks off of Knight one time. There was some type of police raid that was going on at that same location. And when we called off the phone and went there, I guess it was the police that was working off the phone. And it was a setup pretty much. And [Rivers] gave me the phone. He gave me the money. Told me to get out of the car when we pulled up. We were there to meet Knight. I got out of the car. We went and met him. I seen a Ford Taurus drive by. I knew it was the police. Something told me to keep walking. I was on the phone. So I did hear the cops came up on the car that had [Rivers], Amber and their daughter were in. I just kept walking. So I started walking back home that night. I guess the cops searched the car and were searching and asked where the phone was. And they knew he was there to meet Knight. [Rivers] was pretty pissed off about that.

*Id.* at 139-140. Therefore, because Emanuel was present during the prior incident, and knew, first hand, that Rivers was angry because he believed he had been set up, Emanuel's testimony that he believed Rivers was referring to that incident when he stated "Knight got what he deserved" was not purely speculative.[6]

Rivers's second evidentiary claim concerns the testimony of Philadelphia Police Officer David Richardson. The Commonwealth called Officer Richardson to corroborate Emanuel's testimony regarding the incident described above. Officer Richardson testified that on August 6, 2011, at 9:49 p.m., while on patrol in the 15th police district, he "ran" a report on Rivers from the mobile data terminal in his police vehicle. N.T., 11/12/2014, at 69. He did not recall why he ran the report, or where he

_____

[6] We note the case Rivers cites in support of his argument, **Johnson**, **supra**, is distinguishable, as that decision involved a hearsay objection to a police sketch of a motor vehicle accident. **Johnson**, **supra**, 126 A.2d at 721. Because the sketch purported to show how the accident occurred, and the officer who drew the sketch admitted he did not arrive on the scene until five or 10 minutes **after** the accident, the Supreme Court affirmed the trial court's order granting a new trial. The Court explained:

> Obviously this description of the occurrence could have been obtained by the officers only from witnesses interviewed by them, and therefore was purely hearsay testimony, affording no opportunity to plaintiffs to cross-examine the unknown, undisclosed persons upon whose statements this important feature of the report was based.

*Id.* at 722 (citation omitted). Here, as noted above, Emanual's testimony concerning the prior incident was based on his own firsthand knowledge.

was when Rivers was stopped. *Id.* at 70-71. When the officer began referring to a written police report, counsel for Rivers objected. During a sidebar discussion, the trial court ruled the Commonwealth could not use copies of various police reports to attempt to piece together where Rivers was stopped. *Id.* at 91. The court, however, denied counsel's request to strike the last question to the officer, as well as his answer, which read as follows:

> Q. Do you recall where [Rivers] was when this search was done?
>
> A. In the beginning I couldn't recall where this location was. But you get the printouts of the times with other CAD reports of the messages and you're trying to mesh it together. And I have a printout that shows 15-Tom-22.

*Id.* at 71. Officer Richardson had previously testified that a "15-Tom-22" was a "vehicle investigation by … an unmarked unit, plainclothes officers." *Id.* at 66.

Rivers contends the trial court erred in permitting the officer's testimony and denying his motion to strike. He claims the testimony was hearsay, because Officer Richardson had no recollection of the stop without reference to the police reports, and therefore, inadmissible. Rivers's Brief at 29. Moreover, Rivers insists the decision to permit the testimony was "devastating" to him because it provided a motive for the crime. *Id.* at 30.

The trial court, however, insists that it sustained Rivers's objection to the officer's testimony, and precluded the Commonwealth from using the police reports as exhibits. *See* Trial Court Opinion, 10/13/2015, at 15-16.

The court opined: "When coupled with the fact that the Commonwealth does not have to prove motive to establish [Rivers] committed the crimes of First Degree Murder or Conspiracy to Commit Murder, [this issue is] meritless." *Id.* at 16 (some capitalization omitted). *See Commonwealth v. Briggs*, 12 A.3d 291, 340 n. 44 (Pa. 2011) ("[I]t is well established that the Commonwealth is not required, as a matter of law, to prove the accused's motive even where the offense charged is murder in the first degree.") (quotation omitted).

Our review of the transcript from the jury trial reveals the trial court did not sustain Rivers's objection to the officer's testimony; rather, the court only excluded the police reports upon which the officer relied. *See* N.T., 11/12/2014, at 91-92. During a sidebar discussion the next morning, the trial court clarified that the prosecutor could "use the testimony from Officer Richardson … that he ran [Rivers's]" information on his mobile computer. N.T., 11/13/2014, at 16. However, the court did not permit the Commonwealth to present another witness, who it claimed would have testified Officer Richardson was in the area of the 5900 block of Milnor Street when he ran Rivers's information.[7] *Id.* at 14-16.

_____

[7] The Commonwealth was attempting to establish that Rivers was stopped on August 6, 2011, in the same area where the shooting occurred less than a month later, in order to corroborate Emanuel's claim that the shooting was in retribution for the earlier incident. The Commonwealth sought to demonstrate this by presenting the testimony of another police officer who ran a report for a stolen car on Officer Richardson's mobile computer around
*(Footnote Continued Next Page)*

Nevertheless, we find no error or abuse of discretion on the part of the trial court. Although Officer Richardson had no independent recollection of the night in question, he used the police report, which included his payroll number and was run from his mobile computer,[8] to refresh his recollection. Pennsylvania Rule of Evidence 612 provides that a witness "may use a writing … to refresh memory for the purpose of testifying while testifying, or before testifying." Pa.R.E. 612(a). Moreover, the only information the trial court permitted the jury to hear was that Officer Richardson "ran" Rivers's name at 9:49 p.m. on August 6, 2011. Accordingly, even if we would conclude the trial court erred in allowing the Commonwealth to introduce this testimony, any error was harmless, as the prejudice, if any, to Rivers was *de minimus*. **See Poplawski**, **supra**, 130 A.3d at 716 ("An error is harmless if it could not have contributed to the verdict, or stated conversely, an error cannot be harmless if there is a reasonable possibility the error might have contributed to the conviction."). Indeed, Emanuel testified Rivers was stopped by police one or two weeks before the shooting in the

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

the same time as Officer Richardson ran a report on Rivers. The stolen vehicle, which was not connected to Rivers, was located on the 5900 block of Milnor Street. Through this attenuated connection, the Commonwealth sought to prove that Rivers must have been stopped in that same area. The trial court, however, refused to allow the Commonwealth to present the additional testimony. **See** N.T., 11/13/2014, at 10-16.

[8] **See** N.T., 11/12/2014, at 69.

same area where the shooting occurred. *See* N.T., 11/10/2014, at 140-141.

Officer Richardson, however, testified he "ran" Rivers's information through

his mobile computer on August 6, 2011, three and one-half weeks before the

shooting. N.T., 11/12/2014, at 69. The officer did not provide any

testimony as to where or why he stopped Rivers. Accordingly, his testimony

did not corroborate Emanuel's recollection. Therefore, no relief is warranted.

Next, Rivers argues the evidence was insufficient to support his

convictions.

> In reviewing the sufficiency of the evidence, we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the [fact finder's] beyond a reasonable doubt. *Commonwealth v. Murray*, [623] Pa. [506], 83 A.3d 137, 150–51 (2013). Whether sufficient evidence exists to support the verdict is a question of law; thus, our standard of review is de novo and our scope of review is plenary. *Id.* at 151.

*Commonwealth v. Patterson*, 91 A.3d 55, 66 (Pa. 2014), *cert. denied*,

135 S. Ct. 1400 (U.S. 2015).

In the present case, Rivers was convicted of first-degree murder and

criminal conspiracy to commit murder.

> To convict a defendant of first-degree murder, the jury must find that (1) a human being was unlawfully killed; (2) the defendant is responsible for the killing; and (3) the defendant acted with a specific intent to kill. *See* 18 Pa.C.S. § 2502(a); [*Commonwealth v.*] *Spotz*, 759 A.2d [1280,] 1283 [Pa. 2000]. Specific intent to kill can be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997, 1009 (2007). Further, to prove conspiracy, "the trier of fact must find that: (1) the defendant intended to commit or

aid in the commission of the criminal act; (2) the defendant entered into an agreement with another ... to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." ***Commonwealth v. Murphy***, 577 Pa. 275, 844 A.2d 1228, 1238 (2004). Finally, each member of a conspiracy to commit homicide can be convicted of first-degree murder regardless of who inflicted the fatal wound. ***Commonwealth v. Wayne***, 553 Pa. 614, 720 A.2d 456, 460 (1998).

***Commonwealth v. Montalvo***, 956 A.2d 926, 932 (Pa. 2008).

Rivers argues the jury's verdict was based on speculation and conjecture. Rivers's Brief at 19. Specifically, with respect to the charge of first-degree murder, Rivers asserts the evidence did not establish he possessed the specific intent to kill Henderson. ***See id.*** at 23-24. Rather, he claims Emanuel testified Ale shot Henderson only after Henderson threw embalming liquid in Ale's face. ***See id.*** at 23. Rivers argues Emanuel "did not suggest there was a plan to shoot and/or kill the decedent." ***Id.*** Further, he emphasizes Officer Irvine's "unbiased testimony" that the shooter was by himself on the driver's side of the car, while the other two males present remained on the passenger's side of the car. ***Id.*** at 24. Moreover, with respect to his conspiracy conviction, Rivers contends the evidence failed to establish "there was an agreement to shoot/kill the decedent." ***Id.*** at 25.

The trial court, however, found the Commonwealth presented sufficient circumstantial evidence to establish Rivers and Ale conspired to murder Henderson. In particular, the court focused on the "abnormal, overt actions taken by [Rivers] which deviated from [his and Emanuel's] four (4)

previous trips to pick up dippers." Trial Court Opinion, 10/13/2015, at 13. These actions included: (1) using the green Altima rather than Cronon's car, which was available; (2) increasing the order to five dippers, when "money was tight;" (3) bringing Ale to the transaction; (4) directing Emanuel to park in a different spot than usual; and (5) taking the keys from Emanuel once they arrived. *Id.* Moreover, Emanuel testified both Rivers and Ale were armed, and spoke to each other in a language he did not understand. *See id.* Emanuel also recounted that after the shooting, Rivers told him "Knight got what he deserved."[9] *Id.*, *citing* N.T., 11/10/2014, at 139.

The court also found evidence of a conspiratorial agreement in the fact that "[o]n the day of Henderson's murder, [Rivers] and Ale were in consistent, frequent contact and they were both armed." *Id.* Indeed, cell phone records established Rivers and Ale exchanged 19 calls between noon and 8:31 p.m. on the day of the murder. *See id.* Moreover, Rivers instructed Emanuel to use Ale's cell phone to contact Henderson.

Our review of the record reveals no basis to disagree with the trial court. The evidence of Rivers's atypical actions on the day in question,

_____

[9] Emanuel further testified that he believed Rivers was referring to an incident that had occurred a week or two before the shooting when Rivers was stopped in a police raid on his way to meet Henderson to buy dippers. *See* N.T., 11/10/2014, at 139-140. Emanuel claimed Rivers was "pretty pissed off about that" because he believed it was a set up. *Id.* at 140. As will be discussed, *infra*, Rivers argues on appeal that the trial court erred in permitting this testimony at trial.

coupled with his consistent contact with Ale, their secret conversation in a foreign language, and the fact they both traveled to the scene armed with guns, was sufficient to establish, circumstantially, that Rivers and Ale conspired to murder Henderson. Moreover, those actions, coupled with Rivers's post shooting comment "Knight got what he deserved,"[10] was sufficient to demonstrate Rivers possessed the specific intent to kill Henderson. *See Commonwealth v. Simpson*, 754 A.2d 1264, 1269 (Pa. 2000) ("[T]he Commonwealth can prove the specific intent to kill from circumstantial evidence."). As for Rivers's claim that Ale shot the victim only after being doused in embalming fluid, Rivers ignores Emanuel's testimony that Henderson threw the embalming fluid only **after** he saw Ale pointing a gun at him. *See* N.T., 11/10/2014, at 128. Accordingly, we find the evidence was sufficient to support Rivers's convictions of first-degree murder and conspiracy.

Lastly, Rivers challenges the weight of the evidence supporting the jury's verdict. Our review of a weight claim is well-established:[11]

> The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is

---

[10] N.T., 11/10/2014, at 139.

[11] We note Rivers properly preserved his weight of the evidence claim in a post-sentence motion. *See* Pa.R.Crim.P. 607(A)(1). Although the motion was denied by operation of law, the trial court addressed this issue in its Pa.R.A.P. 1925(a) opinion. *See* Trial Court Opinion, 10/13/2015, at 7-11.

not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. On appeal, our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock one's conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence. An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice.

***Commonwealth v. Rosser***, 135 A.3d 1077, 1090 (Pa. Super. 2016) (*en banc*), *quoting* ***Commonwealth v. Gonzalez***, 109 A.3d 711, 723 (Pa. Super. 2015) (citations omitted).

Here, Rivers claims the jury's verdict was against the weight of the evidence because the Commonwealth "failed to establish [he] had the motive to participate in the shooting." Rivers's Brief at 16. Rivers emphasizes there was no evidence presented that he fired a gun, and the only testimony implicating him came from Emanuel, "a corrupt and polluted source," who (1) received immunity in exchange for his testimony, (2) was a regular user of PCP, and (3) had been adjudicated delinquent for making a false report to police. *Id.* Moreover, Rivers asserts Emanuel "displayed post-offense behavior that was consistent with his own guilt," in that he waited two weeks to speak to police, and did so only after being involuntarily committed to a crisis center. *Id.* at 16-17. Lastly, Rivers argues the only "unbiased eyewitness testimony" came from off-duty Philadelphia Police

- 16 -

Officer Clarence Irvine, who incriminated Emanuel as the shooter. *Id.* at 17.

According to Rivers, Officer Irvine reported the shooter was the driver of the

Altima, and was wearing a white t-shirt and jeans, which was what Emanuel

was wearing on the night in question. *Id.* Consequently, Rivers contends:

"A guilty verdict based on such scant evidence should shock one's sense of

justice." *Id.* at 18.

The trial court, however, found the verdict was not against the weight

of the evidence. The court explained:

> This issue lacks merit as in the instant case, the jury's verdict of guilty does not shock the conscience. At trial, the Commonwealth presented the testimony of eye-witness Emanuel as well as the cellphone records of Henderson and [Rivers] to establish that [Rivers] conspired to [m]urder [Henderson] and was therefore responsible for his death. It is uncontroverted that Ale shot Henderson two (2) times in his abdomen and the shots resulted in Henderson's death. Circumstantial evidence showed that [Rivers] had a specific intent to kill, as exhibited by [his] actions and statement after the [m]urder.
>
> Emanuel testified that when he exited [Rivers's] parents' house with [Rivers], Ale was waiting outside. Emanuel further testified to a series of abnormal, overt actions taken by [Rivers] which deviated from their four (4) previous trips to pick up dippers. Emanuel, who possessed a valid driver's license would drive [Rivers] to run various errands in Cronon's white Nissan sedan, however that day, though Cronon's car was present, [Rivers] instructed Emanuel to drive the green Nissan Altima. On that day [Rivers] requested five (5) dippers, increasing the order from his usual one or two (1-2) although money was tight. Ale had never accompanied Emanuel to pick up dippers prior to this incident. When the three (3) men arrived at the agreed upon location, [Rivers] instructed Emanuel to park in a different place than usual, farther away from houses on the street, and thereafter pocketed the keys which was also atypical. In addition to these unfamiliar actions taken by [Rivers], Emanuel testified that [Rivers] and Ale were both armed when they went

- 17 -

to pick up the dippers, and spoke to each other in a language Emanuel did not understand. When Henderson showed up, Emanuel witnessed Ale shoot Henderson multiple times. After the shooting, [Rivers] told Emanuel that Henderson got what he deserved.

Emanuel also testified that [Rivers] asked him to make two (2) phone calls to Henderson from Ale's cell phone, once before [Rivers], Emanuel, and Ale departed to pick up the dippers, and a second time to announce their arrival at the location. This testimony was corroborated by [Henderson's] cell phone records. Police Officer Steve Buckley ("Officer Buckley") testified that he analyzed [Rivers's] cell phone records as well as Henderson's cell phone records. Henderson's cell phone records showed that he received two (2) phone calls from Ale's phone number on the night of the incident, the first call at 8:55 P.M. and the second at 9:04 P.M., minutes prior to the shooting at 9:12 P.M. Officer Buckely also found that [Rivers] and Ale exchanged 19 phone calls between noon and 8:31 P.M. on the day of the incident. On the afternoon of Henderson's [m]urder, [Rivers] and Ale were in consistent, frequent contact and they were both armed. [Rivers] instructed Emanuel to use Ale's cell phone to arrange the transaction, and [Rivers] completed a number of actions which strayed from his typical procedure of buying dippers. This conduct, viewed as a collective, led the jury to believe that both [Rivers] and Ale had the specific intent to [m]urder Henderson. [Rivers] was thus responsible for any actions of his co-conspirator Ale, undertaken in furtherance of the [c]onspiracy. As such, there was no need for the Commonwealth to prove that [Rivers] fired a gun.

The jury was instructed with the standard instruction on how to treat accomplice testimony – corrupt and polluted source, and was informed about Emanuel's mental health issues as well as his Order of Immunity in the instant case. Emanuel testified that he had an open criminal matter in Philadelphia and that he was on probation in another matter. The jury was also informed that Emanuel had juvenile adjudications for Making False Reports and for Robbery. Emanuel stated that no promises had been made to him by the Commonwealth in connection with his testimony in this case, however, it was stipulated that Emanuel had received an Order of Immunity regarding his testimony in the case at bar. The jury, as fact finder, had the sole discretion of assessing the credibility of witnesses at trial. The finder of fact is free to believe all, part, or none of the evidence and to

- 18 -

determine the credibility of the witnesses. Here, the jury chose to believe Emanuel in tandem with cell phone record evidence and came to the conclusion that [Rivers] was guilty of Conspiracy and First[-]Degree Murder. The verdict was not against the weight of the evidence.

Trial Court Opinion, 10/13/2015, at 9-11 (record citations and some capitalization omitted).

Our review of the transcript from Rivers's jury trial reveals no abuse of discretion on the part of the trial court. The jury obviously found Emanuel credible, as was its prerogative, and that assessment does not shock our conscience. **See Rossner**, **supra**.

Furthermore, we disagree with Rivers's contention that the "unbiased eyewitness"[12] testimony of off-duty Police Officer Irvine exonerated him. Rather, Officer Irvine testified he was hanging out with his cousins about 100 feet from the shooting, and he looked in the direction of the crime only after he heard gunshots. N.T., 11/13/2014, at 53-57. Although in his initial statement to detectives, Officer Irvine stated the shooter was the driver of the Altima, he clarified on cross-examination that he saw the shooter get into the driver's **side** of the vehicle after the shooting. **Id.** at 63, 76. Furthermore, while Officer Irvine identified the shooter as the only one wearing a white t-shirt, and Emanuel acknowledged he was wearing a white

---

[12] Rivers's Brief at 17.

t-shirt on the night in question,[13] the officer also stated he had no doubt the shooter was a black male. *Id.* at 63-64, 67. Emanuel, however, is Caucasian, while Rivers, Ale and Henderson are all African American. N.T., 11/10/2014, at 271. Therefore, the jury could have reasonably determined that Officer Irvine's testimony did not completely contradict Emanuel's version of the events in question. Accordingly, bound by our standard of review, we cannot say the trial court abused its discretion in denying Rivers's challenge to the weight of the evidence. *See Rosser*, *supra*.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/19/2016

---

[13] Emanuel testified that on the night of the shooting, he was wearing a white t-shirt and Ale was wearing "dark clothing," but he was "not exactly sure what [Rivers] had on that day[.]" N.T., 11/10/2014, at 269.